John Robert HAMANN, Appellant,

v.

STATE of Iowa, Appellee.

No. 67059.

Supreme Court of Iowa.

Sept. 29, 1982.

Celeste F. Bremer and Kent A. Simmons of Raben, Liebbe, Shinkle & Bremer, Davenport, for appellant.

Thomas J. Miller, Atty. Gen., Lona Hansen, Asst. Atty. Gen., and William E. Davis, Scott County Atty., for appellee.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, LARSON and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

Applicant Hamann filed a Code chapter 663A application for postconviction relief after we affirmed his first-degree murder conviction in *State v. Hamann,* 285 N.W.2d 180 (Iowa 1979). Following denial of his application Hamann appeals and we affirm.

At the murder trial it was conceded that Hamann went to the office of Richard Slattery, a Davenport park board employee, and shot him six times with an automatic pistol. This was the culmination of a long-standing controversy between Slattery and Hamann's father, another park board employee. The jury, unpersuaded by Hamann's insanity defense, found him guilty of first-degree murder.

In this proceeding Hamann sought to prove that in two instances the prosecution presented, or acquiesced in the presentation of, false testimony or misrepresentation of fact, thus denying him a fair trial.

I. *Alleged False Testimony by Investigating Officers.*

Officers Frey and Graff of the Davenport police department investigated this homicide. On May 10, 1977, the day of the shooting, they found five shell casings, and bullet holes in the chair in which Slattery

had been sitting and in the wall behind the chair, made by bullets that traveled through his body.

After the autopsy the following day, these officers learned there were five bullet entry wounds in Slattery's torso, and a sixth wound made by a bullet that had passed through his head. They returned to the scene to search for the missing shell casing and bullet. They found the shell casing under a potted plant. Using a metal detector, they located a hole through the carpet near a bloody area where Slattery's body was found.

Upon direct examination at trial, officer Frey testified the office had been padlocked and secured by the "department" during the interim between his May 10 and May 11 visits. He testified the May 11 investigation revealed a sixth hole in the office floor "immediately adjacent to the head of the deceased," and that the bullet wounds in the victim's head would be in "approximate line with the hole ... found in the floor." Upon cross-examination Frey opined he would "anticipate finding the so-called missing bullet in the area of the floor where the hole was found ... [because he had] used a metal detector and there [was] some type of metal down there." In the following exchange with defense counsel, Frey testified they did not attempt to retrieve this bullet:

Q. You were short one bullet? A. We didn't tear up the floor where we found what we believed to be another bullet hole. We would have to tear up the floor of the office to retrieve the additional bullet.

Q. And that was not done? A. No sur [sic].

Q. You sure of that? A. Yes, sir.

Frey later stated:

Q. As I understand you didn't tear up the area there though, the floor? A. No sir. We simply removed carpeting then that was all.

On opening statement the prosecutor had stated that "the last shot that was fired the evidence will indicate was fired after Mr. Slattery had fallen to the floor dead. The coup de grace. The final death blow." The applicant argues this important assertion and theory, bearing upon his premeditation, was supported by false testimony and misrepresented evidence disclosed by the following evidence in this proceeding:

1. Deposition testimony by a Davenport park employee indicated a padlock was not installed on the victim's office door until May 11, 1977. This fact is buttressed by contents of the officers' own report.

2. The officers' investigation report and testimony in depositions taken for purposes of this proceeding indicate the alleged bullet hole in the floor was at least eighteen inches from the victim's head; the bullet entered the floor at close to a perpendicular angle; and the victim's body had been removed before the hole in the floor was discovered.

3. The investigating officers were getting metal readings virtually everywhere they put the metal detector.

4. Officer Frey admitted upon deposition that the officers had in fact removed floor "lathing" in the area of the alleged bullet hole. The assistant county attorney was present at the time of Frey's trial testimony, knew that the officer had in fact removed some pieces of the finished flooring, but did nothing to apprise the court or jury.

Trial court found Frey had been "technically mistaken" when he testified only carpet had been removed from the floor area surrounding the alleged bullet hole. In its view, however, the response was both accurate and truthful in the context of the cross-examination, which was focused on accounting for the bullets fired, not the specific condition of the floor. The court further found there was no prejudice to defendant resulting from Frey's error because the following evidence supports the State's "coup de grace" theory: (1) three witnesses who had been in the vicinity of

Slattery's office testified several shots were fired, and then a separate final shot; (2) State's psychiatrist testified without objection that applicant's version of the killing included a final, sixth shot to the head; and (3) the doctor who performed the autopsy testified the shot to the head was not part of the first group of shots because it was "pointed in a different direction, almost 180 degrees opposite." The postconviction court concluded any error was both immaterial and harmless beyond a reasonable doubt.

■ Because applicant has alleged constitutional fair-trial violations under the fifth, sixth and fourteenth amendments, we review under the de novo or totality of circumstances standard enunciated in *Kellogg v. State,* 288 N.W.2d 561, 563 (Iowa 1980). *See Sims v. State,* 295 N.W.2d 420, 422 (Iowa 1980); *Hinkle v. State,* 290 N.W.2d 28, 30 (Iowa 1980).

Here the applicant attempts to bring his case within the first of three situations, described in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), in which evidence undisclosed to the defense until after trial may mandate a new trial. In the first situation "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349–50; *see State v. Beeman,* 315 N.W.2d 770, 777–78 (Iowa 1982); *State v. Hall,* 249 N.W.2d 843, 847 (Iowa), *cert. denied,* 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977). A conviction based on such evidence "must be set aside if there is any reasonable likelihood that the false testimony would have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349–50.

■ An analysis of the alleged constitutional violations requires us to scrutinize the evidence in light of several established prerequisites for finding a constitutional vi-

olation. First, the prosecution must either introduce or fail to correct false testimony, *Alcorta v. Texas,* 355 U.S. 28, 31, 78 S.Ct. 103, 105, 2 L.Ed.2d 9, 11–12 (1957) (per curiam); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791, 794 (1935), misrepresent evidence to the jury, *Miller v. Pate,* 386 U.S. 1, 6, 87 S.Ct. 785, 788, 17 L.Ed.2d 690, 694 (1967), or enhance false evidence in jury argument, *Boone v. Paderick,* 541 F.2d 447, 450 (4th Cir. 1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). This requirement is not met where the prosecution presents evidence or fails to contradict evidence relevant to a question upon which reasonable minds could differ. *United States v. Wolf,* 645 F.2d 665, 668 (8th Cir. 1981). Nor does perjury or use of false evidence occur where questions are vague or equivocal, and, taken in context, the witness truthfully could have given the answers he or she did. *United States v. Lasky,* 548 F.2d 835, 839 (9th Cir.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977).

Second, the *Agurs* first situation ordinarily is limited to instances where the false or perjured testimony is given at the trial. *See United States v. Brown,* 562 F.2d 1144, 1150 n.4 (9th Cir. 1977). This requirement is one not implicated here.

■ Third, it is uniformly held that mere perjured testimony, without proof that the prosecution knew it was false, is insufficient basis for a new trial. *Braxton v. Estelle,* 641 F.2d 392, 395 (5th Cir. 1981); *United States v. Illinois,* 619 F.2d 668, 674 (7th Cir.), *cert. denied,* 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980); *Johnson v. Bennett,* 386 F.2d 677, 680 (8th Cir. 1967), *cert. denied,* 390 U.S. 1002, 88 S.Ct. 1247, 20 L.Ed.2d 102 (1968). This knowledge requirement was noted by the *Agurs* court when it identified the first situation in terms of perjured testimony "that the prosecution knew, or should have known, of." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349. The knowledge need not be personal to the trial prosecutor, but may be

imputed from one government attorney to another within the prosecutor's office. *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104, 108–09 (1972). Similarly, knowledge on the part of the police within the prosecutor's jurisdiction is attributed to the prosecutor's office, based on the investigatory, law-enforcement "team" relationship presumed to exist. *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979); *Boone v. Paderick,* 541 F.2d at 450–51; *see* Annot., 34 A.L.R.3d 16, 74–79 (1970).

■ Fourth, even where the prosecutor has used perjured testimony, a new trial is mandated only if materiality standards are met. Effect on the trial, not culpability of the prosecutor, is the critical issue. *Smith v. Phillips,* —— U.S. ——, ——, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87–88 n.10 (1982). The *Agurs* court imposed the strict standard of materiality in the first situation primarily because "corruption of the truth seeking function" has occurred. *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350. This standard is more stringent than the normal harmless error rule. *United States v. Iverson,* 637 F.2d 799, 805 n.20 (D.C.Cir.1980), *reh'g denied,* 648 F.2d 737 (1981) (per curiam). The reviewing court must examine the importance of the tainted testimony, and the weight of the independent evidence of guilt. *Paderick,* 541 F.2d at 451.

■ A fifth principle, not articulated in *Agurs,* holds that a defendant waives his right to complain of perjured testimony on appeal or collateral attack, if at trial he had reason to know such testimony was being used. *United States v. Iverson,* 648 F.2d 737, 739 (D.C.Cir.1981) (per curiam) (Greene, J., statement); *see United States v. Bigeleisen,* 625 F.2d 203, 209 n.2 (8th Cir. 1980). A defendant will not be allowed to withhold the evidence he has, "gamble on an acquittal without, and then later after the gamble fails, present the withheld evidence in a subsequent proceeding." *Ross v.*

*Heyne,* 638 F.2d 979, 986 (7th Cir. 1980) (quoting *Evans v. United States,* 408 F.2d 369, 370 (7th Cir. 1969)).

With these guidelines in mind, we examine applicant's specific complaints of alleged false testimony.

A. *Officer Frey's testimony relating to padlocking the office.*

As noted above, Frey testified Slattery's office was padlocked on the day of the shooting. Evidence on this postconviction proceeding disclosed his memory was faulty: The room was not padlocked until the following day. Officer Graff's postconviction deposition testimony, however, reflects he "sealed off" the office when he took control of the investigation upon his first arrival at the crime scene. The subject was not pursued by applicant and this complaint was neither presented to, nor ruled on, by trial court. We find an inference the room was in some manner "sealed off," or locked, until padlocked the next day. Although we could refuse to consider this alleged constitutional violation because it was not raised below, *Grout v. State,* 320 N.W.2d 619, 620 (Iowa 1982), we nonetheless address the issue on its merits.

We hold this alleged false testimony bears such little relationship to the basis of applicant's murder conviction that it fails to meet the materiality standard. If officer Frey had testified Slattery's office door was unsecured for one day, the jury could have considered the fact only as indicating a possibility for access and an independent source for the alleged bullet hole found in the floor by the officers on May 11. Given the other evidence supporting the State's "final shot" theory, it is highly unlikely a one-day delay in padlocking the room would have dissuaded the jury from a guilty verdict. No ground for postconviction relief appears here.

B. *Prosecutor's opening statement and Frey's testimony concerning relationship of bullet hole and victim's head wound.*

■ These alleged grounds for new trial concededly occurred at trial. We will as-

sume for purposes of this analysis the statement and testimony were material. We nonetheless hold the prosecutor's actions do not constitute use of false testimony or misrepresentation of evidence. Whether the hole in the floor, coupled with other supporting evidence, was related sufficiently to Slattery's head wound to support the State's "final shot" theory was a matter for the jury. The prosecutor is entitled to some latitude in analyzing evidence and presenting argument to the jury. He or she may draw conclusions and argue all possible inferences that reasonably flow from the record. *State v. Mulder,* 313 N.W.2d 885, 892 (Iowa 1981); *State v. Fryer,* 243 N.W.2d 1, 7 (Iowa 1976). Similarly, we believe good faith references on opening statement to inferences that may be drawn from potential evidence are permissible, even though the evidence produced may later modify the inference. *See State v. Roberts,* 255 Iowa 166, 170–71, 121 N.W.2d 513, 515–16 (1963); *State v. Tornquist,* 254 Iowa 1135, 1140–41, 120 N.W.2d 483, 487 (1963). Although defendant contends the prosecutor presented the evidence as proving a final shot *after* Slattery fell to the floor, the record reflects that while the prosecutor so stated in opening, in closing he argued the final shot was fired *as* the victim fell to the floor. The latter theory is arguably consistent with both the location of the alleged sixth bullet hole and defendant's own description of the killing. Moreover, the questions the prosecutor asked Frey were vague enough that the latter's answers, taken in context, were not untruthful. *See United States v. Lasky,* 548 F.2d at 839.

#### C. The metal detector readings.

█ At trial Frey opined that based on metal detector readings, further exploration under the floor in the area of the alleged bullet hole would reveal a bullet. On postconviction deposition he testified the detector would pick up a reading "any place where there was a nail." We are not convinced these statements disclose the trial

testimony was false. No inquiry was made whether the same type of metal detector reading was obtained over the alleged bullet hole as was obtained over the nails. That there was a difference is demonstrated by evidence that the detector provided a reading over an otherwise unremarkable area that caused the officers to make a special exploration. This disclosed a bullet-sized hole through the carpet that extended through the subfloor.

At the most, what occurred here was a failure at trial to volunteer information regarding the other detector readings. This invokes the principles applicable not to the first situation described in *Agurs,* but the third situation—nondisclosure of exculpatory information. *See Armento v. Baughman,* 290 N.W.2d 11, 16 (Iowa 1980). A new trial is warranted only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355; *Armento,* 290 N.W.2d at 16. Assuming the omitted information was in fact exculpatory, and given the other persuasive evidence supporting the prosecution's "final shot" theory, we hold disclosure of this evidence would not have created a reasonable doubt in the jurors' minds. No ground for new trial is raised by this omission.

#### D. Destruction of the floor surrounding the alleged bullet hole.

█ Applicant heavily relies on Frey's testimony that only the carpet was removed to reveal the bullet hole in the floor. Subsumed is the inference that there was no hole through the "slatting" that was removed by the officers.

The picture that emerges from the postconviction depositions and evidence is that there was a thin layer of narrow tongue-and-groove hardwood flooring, variously described from one-eighth to three-eighths in thickness, beneath the carpet. It was laid on a "hard, thick wood floor." The officers who could find no sixth bullet hole in the walls of the office, obtained a metal detec-

tor reading that caused them to be interested in looking beneath the carpet at a point near a bloody area on the carpet, about seven inches from the wall. When the carpet was pulled up, a hole was disclosed on the rubberized underside of the carpet. It had not been visible in the top surface of the carpet. This hole corresponded with a small area of splinters in the hardwood layer of flooring. Graff described it in postconviction deposition as "some wood chips that looked like some projectile or some object may have passed through the floor." Frey in postconviction deposition testified that on the hardwood layer was a "splintered area which could be caused by a bullet going in at an angle to a thin strip of wood."

The officers pulled up the hardwood "slatting" with a crowbar and discovered a hole extending through the main subfloor directly under the hardwood splintered area. They called the assistant county attorney and asked if he wanted them to saw through the subfloor to retrieve the bullet. They were told not to tear up the floor to get the bullet, that it was not needed.

Although Frey testified only the carpet was removed, his cross-examination, in context, was directed to an accounting for the sixth bullet, as the postconviction court found. It is plain that to Frey the "floor" was the "hard, thick wood floor" that was overlaid by the hardwood veneer. We are convinced that had the attention of Frey and Graff been directed to the veneer their testimony as to its appearance would only have reinforced their theory that they had traced the sixth bullet. Given the weight of the independent evidence of defendant's "final shot," Frey's erroneous response hardly could have affected the jury's judgment.

Further, it seems apparent to the court that seasoned and experienced defense counsel must have known the slatting had been removed after the carpet was taken up in order to trace the hole in the main floor. At that point in the trial exhibit 25, a photograph produced by the State, had been admitted into evidence without objection. This close-up, eight-by-ten inch color picture was identified as a "photograph of the floor beneath the carpet after we pulled it back showing the location of the bullet hole in the floor." The fresh debris and gouge marks clearly show the hardwood veneer had been pulled aside, after the officers rolled the carpet back, to disclose the round hole in the main floor. Defense counsel had reason to know of Frey's mistaken answer, but did not elect to call this to his attention. We hold applicant thus waived his right to complain about the testimony in this postconviction proceeding. *Iverson,* 648 F.2d at 739; *Ross,* 638 F.2d at 986.

■ Finally, we review all the above complaints in terms of the importance of the testimony, and the weight of the independent evidence of guilt. *Boone v. Paderick,* 541 F.2d at 451. At the most, all of these alleged violations applicant relies on bear only upon the State's contention his killing Slattery was premeditated. Other and overwhelming trial evidence, including the testimony of applicant's expert witnesses, discloses without controversy that his act was premeditated. In the criminal case the battleground selected was not premeditation, but the issue we resolved on the direct appeal. There was ample testimony from the defense that the applicant planned the killing, considered and discarded various weapons, and struggled within himself whether or not to kill Slattery. At last, because he was convinced Slattery was an evil man, applicant took careful aim and shot him six times. Viewed in light of this evidence of guilt and premeditation, the issues raised here relating to a "final shot" do not assume sufficient importance to warrant granting a new trial.

II. *Alleged False Testimony of the State's Psychiatrist Regarding Dr. Lyons' Alcohol Problem.*

As above noted, at the criminal trial the defense acknowledged the killing, but relied

on the defense of insanity. Testimony on the insanity issue was presented by a clinical psychologist and a psychiatrist for the defense and by psychiatrist Dr. James M. Lyons for the State.

Dr. Paul Loeffelholz, clinical director of Iowa Security Medical Facility at Oakdale, was Dr. Lyons' immediate supervisor. He was deposed prior to the criminal trial. Defense counsel probed into Dr. Lyons' work history and his alcoholism. Although Dr. Loeffelholz stated that antabuse was given to Dr. Lyons on the days he was at the facility and a supply given him for weekends, he also testified that

> Dr. Lyons has missed two days of work out of the last ten months. There have been episodes. We have had one episode where he missed a couple of days, but, you know, there is a price to pay when you get sick. That is probably a better work record than 95 percent of the employees in the State of Iowa.
>
> Q. You say he got sick two days? What did he do, fall off the wagon? A. From drinking, but that is a better work record than—
>
> Q. Do your records indicate how long he had this drinking problem? A. Quite a while, probably about—I can't give it to you for sure, but I would expect it was going on for at least five years and maybe more.

At the criminal trial, the prosecution made a motion in limine to prohibit defense cross-examination of Dr. Lyons regarding his alcohol problem. Although trial court's ruling was not a model of clarity, it did specifically permit the defense to inquire into the "employment aspects" of Lyons' background, and to make a limited inquiry regarding Dr. Lyons' use of antabuse and the present effect of alcohol on his duties. Defense counsel was prohibited from exploring the possibility of disqualification from practice under Iowa statutory provisions.

During Dr. Lyons' direct examination by the State, he testified, "I am an alcoholic who has been dry almost three years. I am on antabuse every day." He further testified he had been employed by the Iowa Department of Corrections on condition of total sobriety. During cross-examination the following question was asked and answered:

> Q. And you take antabuse—A. Once a day, yes.

Neither party further explored Dr. Lyons' alcohol problem.

In this proceeding applicant obtained Dr. Lyons' personnel records maintained by the Iowa Security Medical Facility. These disclosed Dr. Lyons had not been taking antabuse consistently; he was absent from work October 12, 1977, due to drinking and Dr. Loeffelholz delayed terminating his employment only after a visit by Dr. Lyons' family; termination occurred February 27, 1978, after Dr. Lyons failed to report to work due to drinking.

Applicant argues that falsity of testimony and misrepresentation of facts by Lyons and Loeffelholz, coupled with the ruling on State's limine motion, operated to exclude examination of Dr. Lyons' credibility to express an opinion as to applicant's sanity. This, he asserts, denied him a fair trial.

The postconviction court found applicant had not been denied the opportunity to inquire into Dr. Lyons' competency, but simply failed to do so. The State had opened up the area of Dr. Lyons' alcohol problem, but applicant failed to pursue the subject on cross-examination. The court construed its limine ruling—rightly, we hold—as only precluding questions relating to state statutes that might, if implemented, affect Dr. Lyons' license and right to practice psychiatry. The court found that any error was both immaterial and harmless beyond a reasonable doubt.

This ground for new trial, like that addressed in division I, is bottomed on alleged perjured testimony. Because different principles apply, we separately analyze the testimony of Dr. Loeffelholz and Dr. Lyons.

## A. Pretrial deposition testimony of Dr. Loeffelholz.

Because Dr. Loeffelholz's testimony was not given at trial it is subject to principles applicable to the third situation described in *Agurs,* not the first. *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355; *Armento,* 290 N.W.2d at 16. The prosecution may not withhold exculpatory evidence from a defendant, even absent a request, if the "omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355.

■■■ Certain principles apply to both the first and third *Agurs* situations. The prosecutor has no duty to seek out exculpatory evidence. *United States v. Riley,* 657 F.2d 1377, 1386 (8th Cir. 1981). The prosecution bears no responsibility to volunteer information not in its possession and of which it is unaware. *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.), *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir. 1975), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976).

Defendant concedes the prosecution had no knowledge of the alleged inaccuracies in Dr. Loeffelholz's testimony, but argues that Dr. Loeffelholz's knowledge, as a State officer and employee, should be attributed to the State. Defendant cites *United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir. 1961), as authority for attribution. In that case, the Second Circuit attributed possession of exculpatory information by the Antitrust Division of the United States Attorney General's office to the prosecutor. The Division had possession of the documents by virtue of its involvement in preparation of the government case. *Consolidated Laundries Corp.,* 291 F.2d at 570. The *Consolidated Laundries Corp.* holding comports with the rule enunciated in several more recent cases. No distinction is drawn strictly on the basis of involvement of different government agencies. *United States v. Auten,* 632 F.2d 478, 481 (5th Cir. 1980); *Antone,* 603 F.2d at 569; *United States v. Haldeman,* 559 F.2d 31, 73–74 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The focus is instead upon the "prosecution team," which includes investigative units under the prosecutor's control, or agencies allied with the prosecutor in connection with the subject case. *Auten,* 632 F.2d at 481; *Haldeman,* 559 F.2d at 73–74; *United States v. Deutsch,* 475 F.2d 55, 57 (5th Cir. 1973).

■■■ Attribution will not occur where the information described by the defense is controlled neither by investigative or prosecutorial arms of the executive, nor controlled by any other agency involved in the offense or related transactions. *United States v. Ehrlichman,* 389 F.Supp. 95, 97 (D.D.C.1974), *aff'd,* 546 F.2d 910 (D.C.Cir. 1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). The critical factor is superior access on the part of the prosecution, and the need to equalize access for both parties. Thus no violation occurs where neither the prosecution nor the defense has access to particular testimony. *Calley v. Callaway,* 519 F.2d 184, 224 (5th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).

On casual examination, the instant case would appear to fall into the "prosecution team" category. Dr. Loeffelholz and Dr. Lyons were both employed by the Iowa Security Medical Facility. Although that institution is a part of the Iowa Department of Social Services, it works closely with the prosecution in cases involving potentially insane criminal defendants. However, more substantial factors militate against attribution. Iowa Code section 68A.7(11) renders personal information in personnel records of public bodies confidential, subject to release only by a court, the lawful records custodian, or other duly authorized person. The prosecution and defense thus were subject to equal constraints in obtaining the information in Dr. Lyons'

personnel file. The concept of attribution is not required to equalize the relative positions of the parties.

We therefore hold that the doctrine of attribution was inapplicable in these circumstances. The prosecution is not charged with knowledge of the information allegedly undisclosed by Dr. Loeffelholz. Moreover, even if attribution were applicable in this case, no error may be grounded on Dr. Loeffelholz's deposition because the allegedly suppressed evidence is not sufficiently material.

■ Under the *Agurs* decision, exculpatory evidence suppressed by the prosecution following a general defense request or no defense request for exculpatory evidence constitutes grounds for new trial if it creates a reasonable doubt that would not otherwise exist. 427 U.S. at 113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. Evidence allegedly concealed by the State in the instant case, regarding the magnitude of Dr. Lyons' alcohol problem, would have had minimal jury impact. The record reflects no evidence that Dr. Lyons' alcoholism specifically affected his ability to evaluate defendant's psychiatric condition. Applicant was admitted to the security facility for examination August 15, 1977. Examination and evaluation were completed October 4, 1977. Nothing in the excluded evidence indicated Dr. Lyons was drinking or missed work from drinking during this period. Lyons' personnel records reflect continual confidence in his professional competence throughout the defendant's evaluation period. Defense counsel conceded at trial that any testimony he might offer would go only to Dr. Lyons' employment experience and qualification as an expert.

Finally, all three expert witnesses, including the two retained by defendant, rendered opinions consistent with a finding of sanity under the *M'Naghten* rule. *See Hamann*, 285 N.W.2d at 181–83. Dr. Lyons' testimony thus was cumulative only, not the linchpin of the State's case. The omit-

ted evidence would have little bearing on his credibility. We find that no reasonable doubt would have been created by the alleged exculpatory evidence that did not exist already. We deny relief on this ground.

B. *Testimony of Dr. Lyons.*

Dr. Lyons' testimony, unlike that of Dr. Loeffelholz, was elicited at trial. It is therefore subject to the principles governing the first *Agurs* situation if the remaining prerequisites of falsity, prosecution knowledge, materiality, and lack of defense knowledge are met.

The contents of Dr. Lyons' personnel file directly contradict his testimony that he was on antabuse every day and had been "dry" almost three years. His medication order indicates failures in taking the drug on a daily basis. Dr. Loeffelholz's memoranda report drinking by Dr. Lyons on at least one occasion within four months of trial.

Both counsel were aware that Dr. Lyons had not abstained from use of alcohol for three years. We have set out Dr. Loeffelholz's deposition testimony disclosing one drinking episode within the year prior to trial and referring to other "episodes."

We do not condone the State's failure to correct Dr. Lyons' testimony. However, where defendant in a criminal case has reason to know the State has employed false testimony, he must act to impeach the witness at trial. He will not be permitted to gamble on an acquittal and withhold the impeaching evidence for use in a subsequent proceeding. *United States v. Iverson*, 648 F.2d at 739; *Ross v. Heyne*, 638 F.2d at 986; *Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir. 1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367, *reh'g denied*, 452 U.S. 932, 101 S.Ct. 3070, 69 L.Ed.2d 433 (1981); *see United States v. Bigeleisen*, 625 F.2d at 209 n.2. This applicant failed at trial to pursue a solid, known basis for impeaching Dr. Lyons' false testimony. He therefore cannot raise the issue

by way of application for postconviction relief.

■ Trial court's ruling on the limine motion provides no excuse for applicant's failure to pursue the matter. Inquiry was permitted regarding Dr. Lyons' use of antabuse and the effect of alcohol on his duties. Trial court specifically forbade inquiry only into the possibility of Dr. Lyons' disqualification from practice under applicable Iowa statutes. Any doubt as to the ruling's parameters should have been dispelled by the scope of the State's direct examination of Dr. Lyons, which included testimony concerning Dr. Lyons' antabuse program and Dr. Lyons' statement he had been "dry" for three years.

Applicant concedes the prosecution was unaware of the falsity of Dr. Lyons' testimony he took antabuse every day. Applicant, however, again argues that knowledge of the true facts should be attributed from Drs. Loeffelholz and Lyons to the prosecution. We reiterate, however, this is not a situation where attribution is required to equalize positions of the parties.

Nonetheless, even if knowledge of falsity of Dr. Lyons' testimony were to be attributed to the prosecution, the impeaching testimony would lack sufficient materiality to warrant a new trial. It is true that when evidence affecting the credibility of a principal prosecution witness is falsified or suppressed, materiality is frequently found. See Giglio v. United States, 405 U.S. at 155–56, 92 S.Ct. at 766, 31 L.Ed.2d at 109; Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959); United States v. Bigeleisen, 625 F.2d at 207; Boone v. Paderick, 541 F.2d at 453. But when the witness's testimony is not crucial to the State's case, or the falsified or suppressed evidence is unlikely to impact significantly on the witness's credibility, a finding of materiality is less likely. United States v. Crockett, 534 F.2d 589, 602–03 (5th Cir. 1976); Calley v. Callaway, 519 F.2d at 221–22; see Smith v. Phillips, —— U.S. at

——, 102 S.Ct. at 947, 71 L.Ed.2d at 87–88 n. 10 (1982) (effect of misconduct on trial, not prosecutorial culpability, is the critical inquiry).

In this case, falsity of Dr. Lyons' testimony as to daily use of antabuse minimally affected his qualifications and credibility. We again note that the record indicates, and the postconviction court found, that all three expert witnesses, including two retained by defendant, rendered opinions supportive of sanity under the M'Naghten rule. See State v. Hamann, 285 N.W.2d at 181–82. Thus Dr. Lyons' testimony, and any evidence remotely affecting his credibility, cannot be considered crucial. There is no reasonable likelihood his false statement could have affected the jury's judgment.

We find no error of constitutional stature relating to the testimony of Dr. Loeffelholz and Dr. Lyons.

C. Totality of the circumstances.

■ Defendant argues that even if no single one of the foregoing claims rises to constitutional error, their combined effect is a denial of due process, citing Bigeleisen, 625 F.2d at 203. The Bigeleisen court held the combined effect of false testimony by the key prosecution witness regarding the nonexistence of a plea agreement, and the prosecution's argument designed to rehabilitate the principal witness's testimony based on facts not in evidence, deprived the defendant of due process. 625 F.2d at 210.

In the case before us, even viewing complainant's allegations in the aggregate, the requisite level of materiality, as we already have observed, does not exist. We find no constitutional violation even under the totality of the circumstances.

We affirm the judgment entered by the postconviction court.

AFFIRMED.