# IN THE COURT OF APPEALS OF IOWA

―――――――――――

No. 24-1489
January 7, 2026

―――――――――――

**Stephen Shawn Keyes,**
Applicant–Appellant,

v.

**State of Iowa,**
Respondent–Appellee.

―――――――――――

Appeal from Iowa District Court for Linn County,
The Honorable Justin Lightfoot, Judge.

―――――――――――

**AFFIRMED**

―――――――――――

Erica Nichols Cook (argued) of the State Public Defender Wrongful
Conviction Unit, and Tara Thompson (pro hac vice) of The Exoneration
Project, New York, New York, attorneys for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant
Attorney General, attorneys for appellee.

―――――――――――

Heard at oral argument
by Greer, P.J., and Schumacher and Ahlers, JJ.
Opinion by Schumacher, J.

**SCHUMACHER, Judge.**

Stephen Keyes, convicted of two counts of first-degree murder after the 1996 deaths of his wife and two-year-old child, appeals the district court's grant of the State's motion for summary judgment and the denial of his own motion for summary judgment in his second postconviction-relief (PCR) proceeding. Keyes asserts there is newly discovered evidence showing actual innocence; the State failed to produce evidence when challenging Keyes's motion for summary judgment; the district court misapplied the *Brady* rule in granting the State's motion for summary judgment; a nexus exists between the newly discovered evidence and Keyes's conviction, which satisfies the exception to the statute of limitations under Iowa Code section 822.3 (2022); and his counsel was ineffective at the underlying criminal trial as well as his first PCR trial. Upon our review, we affirm.

## I.    Background Facts and Proceedings

In the early morning hours of December 26, 1996, a fire started in the garage of Keyes's home that he shared with his wife, Sandra, and three young children. Keyes escaped the fire with two of the children. Sandra and the youngest child died from injuries caused by the fire. There were several witnesses to the fire, including motorists who saw the fire in the garage while driving by the home. Some witnesses stopped at the scene in attempts to assist the family or call emergency services.

While investigating the fire, State Fire Marshal Agent Hiles used his dog, Sax, to identify potential accelerants, which would indicate the fire was set intentionally. Sax identified accelerants in nine areas within the garage. Based on this and other evidence, Keyes was charged with two counts of first-degree murder.

At trial, the State offered evidence suggesting that Keyes and Sandra's marriage was on the rocks and that Keyes had been involved with one of his female co-workers. The State also offered evidence that Keyes started the fire by pouring gasoline on several bags of garbage within the garage. The State alleged that Keyes exited the house while the fire spread, sat in his van, and only returned inside to retrieve two of the children after a passing motorist stopped to assess the situation. Additional evidence alleged that a table was wedged into the base of the staircase to prevent Sandra from escaping the fire.

Agent Hiles testified that in his opinion the fire was started using an accelerant, and another fire marshal also testified to his belief the fire was not accidental. Keyes's son, M.K., who was eight years old at the time, testified Keyes woke him up that morning, that the house "wasn't very smoky" while exiting, and that he only noticed the fire after sitting outside. M.K. also testified that Keyes waited for fifteen minutes before calling emergency services.

Doug and Barbara Lint, Sandra's parents, testified about Keyes's perpetual financial difficulties and the marital strain between Keyes and Sandra. Other evidence showed that Keyes obtained renter's insurance on the home and its contents eleven days before the fire. Keyes was also the beneficiary of life insurance for his wife and two children. And although Sandra's parents learned that Keyes and Sandra did not have money to buy Christmas gifts for the three children, evidence was offered that Keyes purchased a tennis bracelet for his girlfriend, paying with a personal check.

A first responder testified about Keyes's behavior at the scene, which many found suspicious. An emergency room nurse also testified about his behavior while at the hospital, including the fact that his girlfriend picked him

up from the hospital, that Keyes and this woman kissed at the hospital, and that the pair "kind of chuckled." When they walked away, the two were holding hands. A fellow inmate at the Linn County jail, Young, testified that he overheard Keyes tell another inmate that he started the fire using gasoline.

The owner of the home installed three smoke detectors just before renting the home to the Keyes family. Before the fire, the second story smoke alarm had been taken down and placed in a drawer under articles of clothing.

At trial, Keyes's defense expert, Bruce Johnson, testified that the damage caused by the fire precluded identification of the origin and cause of the fire. On rebuttal, Agent Hiles stated that Johnson's assessment was in error because Sax had the ability to differentiate between accelerants and other synthetic odors.

During closing arguments, the State described Keyes's inactions and actions as proof of his guilt. The State also asserted that the type and origin of the fire and the subsequent damage was proof that Keyes started the fire intentionally with a liquid accelerant. The State also argued that because Sandra and J.K.—the child who died in the fire—failed to escape, it was evidence that Keyes started the fire, intending to kill them.

Following deliberations, the jury found Keyes guilty of two counts of first-degree murder. He was sentenced to life in prison, with no possibility of parole. This court affirmed his convictions on direct appeal in 1999, preserving his ineffective-assistance-of-counsel claims for potential PCR proceedings.[1]

---

[1] *State v. Keyes*, No. 97-1997, slip op. (Iowa Ct. App. May 26, 1999).

Keyes filed a PCR application in 1999 based on ineffective assistance of counsel. Trial was not held until 2014.[2] The PCR application was denied by the district court, and our court affirmed that decision in 2017.[3]

Keyes filed the PCR action subject to this appeal in 2022, alleging his convictions violated both the Iowa and United States Constitutions. Keyes also argued there was new evidence which showed the fire started accidentally within the wall between the garage and the house, allegedly supported by new scientific understandings of fire toxicology and behavior which were unavailable at the initial trial and the first PCR trial. And Keyes argued that the State was not entitled to summary judgment because it failed to put forward evidence in support of its motion; that the district court incorrectly applied *Brady v. Maryland* when granting the State's motion for summary judgment due to the allegedly newly discovered "Strobel Letter" in the possession of the Attorney General's Office;[4] that a nexus existed between the newly discovered evidence and Keyes's convictions which should except him from the three-year statute of limitations set forth in Iowa Code section 822.3; and that his counsel was ineffective in prior proceedings.

## II.    Analysis

We review summary judgment rulings for correction of errors at law. *Kunde v. Est. of Bowman*, 920 N.W.2d 803, 806 (Iowa 2018). "Evidence is viewed in the light most favorable to the party opposing summary judgment."

---

[2] The delay appears to be primarily due to multiple attorney withdrawals.

[3] *Keyes v. State*, No. 15-0383, 2017 WL 1086781 (Iowa Ct. App. Mar. 22, 2017).

[4] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

*Id.* When summary judgment is based on a constitutional issue, our review is de novo. *Weizberg v. City of Des Moines*, 923 N.W.2d 200, 211 (Iowa 2018). "[T]he principles underlying [a] summary judgment procedure apply to motions of either party for disposition of an application for postconviction relief without a trial on the merits." *Schmidt v. State*, 909 N.W.2d 778, 784 (Iowa 2018) (alterations in original) (citation omitted). Summary judgment is proper if the moving party demonstrates the nonexistence of a disputed material fact and "the moving party is entitled to a judgment as a matter of law." *Id.* (citation omitted). "We also draw all legitimate inferences from the evidence in favor of the nonmoving party." *Id.*

**A.     Newly Discovered Evidence and Timeliness of Second PCR Application**

Keyes argues that newly discovered evidence exists which proves his actual innocence and that his convictions are unconstitutional due process violations under both the Iowa and United States Constitutions. *See* Iowa Code § 822.2(1)(a), (d); *Schmidt*, 909 N.W.2d at 798. Keyes also argues that because of this newly discovered evidence, he has satisfied the ground-of-fact exception to the three-year statute of limitations for initiating PCR proceedings. *See* Iowa Code § 822.3 ("[T]his limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period.").

A PCR applicant who relies on "the ground-of-fact exception must show the ground of fact is relevant to the challenged conviction," the "nexus requirement." *Schmidt*, 909 N.W.2d at 798 (citation omitted). A ground of fact is relevant if the fact "has the potential to qualify as material evidence for purposes of a substantive claim under section 822.2." *Id.* at 798–99 (citation omitted). For limitations purposes, an applicant need not demonstrate that

6

the ground of fact would have changed the outcome of the underlying criminal case. *Id.* at 799.

To succeed on an actual-innocence claim in the context of a dispositive summary judgment ruling, Keyes must show that there exists no issue of material fact that "no reasonable fact finder could convict the applicant of the crimes for which . . . the applicant [was found] guilty in light of all the evidence, including the newly discovered evidence." *Id.* at 797. To prevail in a PCR proceeding based on newly discovered evidence, the applicant must show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*More v. State*, 880 N.W.2d 487, 499 (Iowa 2016). "The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation." *Id.*

Keyes asserts that evidence offered for an actual-innocence claim need not strictly be "newly discovered" but can also be "newly presented evidence." Either way, for claims raised in a second PCR application, the applicant must show the evidence pertaining to the claim could not have been raised or discovered during previous PCR actions. *See Lindaman v. State*, No. 22-1032, 2023 WL 2908647, at *2 (Iowa Ct. App. Apr. 12, 2023) ("*Schmidt* does not apply to overcome the statute of limitations where the evidence put forward to support a claim of actual innocence was *available* to the applicant or could have been discovered with due diligence within the limitations period" (emphasis added) (citation omitted))).

For evidence introduced in a criminal case to qualify as violative of an applicant's due process rights, "the evidence must have been so inherently unreliable that even allowing the jury to consider the evidence rendered the trial fundamentally unfair." *More*, 880 N.W.2d at 511–12. Merely unreliable evidence which is not fundamentally unfair does not violate an applicant's due process rights. *Id.*

Here, Keyes argues that recent scientific developments regarding fire investigations based on the National Fire Protection Association Guidelines 921 (NFPA) qualify as newly discovered evidence to overcome the time bar under section 822.3. Iowa adopted NFPA 921 as the standard for fire investigations in 2011. In Keyes's initial PCR action, he also relied on the NFPA, which our court found was not newly discovered evidence. *See Keyes*, 2017 WL 1086781, at *2, *5. Keyes now asserts that the current version of the NFPA 921, which is generally updated every three years, describes new science that shows:

> (1) the use of toxicology in fire investigations is newly discovered and disproves the State's fire origin and cause, instead demonstrating that this fire was an accident; (2) children are not reliable witnesses; (3) canine accelerant detection canines are not reliable evidence of arson and modern day standards do not permit Hiles's testimony; and (4) the State presented false testimony regarding cause and origin of the fire.

We agree with the district court's determination that this alleged new evidence concerning the evolving standards of NFPA 921 was raised in Keyes's previous PCR action. As we stated in the previous PCR appeal decision, "[w]hile each marginal advance in science cannot form the basis of a new trial, watershed developments are a different story." *Id.* at *8 (quoting *More*, 880 N.W.2d at 509). The facts which uphold Keyes's fire-science-related assertions were available during the prior PCR action, where Keyes asserted similar claims to the ones raised here. *See* Iowa Code § 822.8.

Although NFPA 921 is updated regularly with advancing scientific opinions, these advancements do not qualify as newly discovered evidence or "watershed developments." *See Keyes*, 2017 WL 1086781, at *8. Moreover, the expert report based on NFPA 921 methods, which Keyes heavily relies upon, determined the fire was accidental based on lack of human involvement and cites to studies which either were published during 2014 or earlier, indicating the information was available in the prior PCR action. As stated in Keyes's previous PCR appeal, "[w]e conclude this evidence is cumulative or impeaching—not newly discovered evidence." *Id.* Accordingly, we find that this evidence does not overcome the statute of limitation exception under section 822.3.

Although we need not reach the merits of whether Keyes's alleged new ground of fact based on newly discovered evidence would have changed the outcome of trial, we choose to do so.[5] *See Harrington*, 659 N.W.2d at 521. Even if we were to conclude the NFPA 921 developments qualify as newly discovered evidence that would overcome the statute of limitations under section 822.3, which we do not, we are not convinced the verdict would have been different if this new scientific evidence had been available. *See Keyes*, 2017 WL 1086781, at *9. We still find that:

> Other evidence—both direct and circumstantial—contradicted Keyes's story. This evidence included Keyes's own inconsistent statements, observations of the fire and of Keyes by eyewitnesses, medical evidence indicating minimal smoke inhalation, location of smoke detectors found in the home, and Keyes's postfire behavior and demeanor. Other

---

[5] Because we find that the "newly discovered evidence," which Keyes's asserts qualifies as a "new ground of fact" was available previously, the evidence, which might have a nexus to the original trial, was time-barred, and so we are not required to analyze whether the evidence would probably have changed the outcome of the underlying case. *See Harrington v. State*, 659 N.W.2d 509, 521 (Iowa 2003); *see also* Iowa Code § 822.3.

evidence pointed to motive, including Keyes's poor treatment of his wife, his relationship with another woman, his financial woes, and his recent purchase of renter's insurance. There was also testimony by a jailhouse informant who said Keyes told him how he set the fire.

Keyes had the motive and means; he was at the right place at the right time, and his behavior generally points in the direction of guilt. We recognize that the fire investigation may have been flawed and that any singular piece of evidence in isolation may not have been convincing, but it was the combination of facts and circumstances that strongly point toward Keyes's guilt.

*Id.*

We are not convinced these NFPA 921 developments would have probably changed the outcome of trial. *More*, 880 N.W.2d at 499. The district court did not err in granting summary judgment to the State on this issue based on the relevant evidence not qualifying as newly discovered.

**B.    Evidentiary Support for the State's Summary Judgment Motion**

Keyes asserts the State produced no evidence in its motion for summary judgment, which was granted by the district court. Keyes argues the State failed to refer to any evidence or the record in its motion and relied on "mere denials." So, Keyes claims that due to lack of citation in the motion, the district court should have considered his assertions as true and without factual opposition and granted summary judgment for Keyes. *See* Iowa R. Civ. P. 1.981(5).

We disagree with Keyes's assertions. The State's motion for summary judgment cites to the record, several pieces of evidence, and case law. The State relies on evidence that, although circumstantial, rebuts the claims made by Keyes's experts. The State's motion likewise used the record, case law,

and statutes to argue Keyes's claims were barred and cumulative. We find the State adequately referred to evidence and the record in its motion for summary judgment.

## C. Application of *Brady v. Maryland* Regarding the Strobel Letter

Keyes asserts that the Iowa Attorney General's office, which represented the State on his direct appeal, was in possession of a letter delivered by an Alcohol Tobacco and Fire (ATF) Agent Strobel. This letter was delivered in 1993 to Assistant Attorney General Thomas Tauber, about three years before the death of Keyes's wife and child. The letter stated, in Strobel's opinion:

> A positive result from an accelerant detection canine is insufficient evidence that an accelerant is present. The dog, for instance, may be alerting to material which could be used as an accelerant but in a particular case is present at the fire scene for legitimate reasons (e.g. kerosene and a kerosene heater). Because of this we assert that the use of a canine's indication to the presence of an accelerant is only one of the many factors used in a fire investigator's origin and cause determination and can never be a sole basis for that determination.

> Additionally, any alert not confirmed by laboratory analysis must be considered a false alert (false positive) for the purposes of origin and cause determination. The accelerant detection canine is a tool used to assist the fire investigator in the collection of suitable samples for forensic laboratory analysis. If the forensic laboratory examination of the sample is negative, any positive indication by the canine at the fire scene is irrelevant.

> The above statements do not contradict the fact that a properly trained canine is a reliable detector of accelerants.

Keyes asserts that because this letter was in possession of the Iowa Attorney General's office at the time of indictment, it should have been

provided to the defense and thus constituted a *Brady* violation. *See* 373 U.S. at 87.

Keyes argues that the contents of the Strobel letter show that Agent Hiles's testimony concerning the canine Sax's "hitting" on remains of liquid accelerants within the garage, which did not test positive in the laboratory, was false and misleading. And because the State knew of this letter, they also knew the testimony was false, and the result of the trial was affected. Keyes argues that the Iowa Attorney General's office was a part of the State's general prosecution team and was bound to turn over the letter to the defense as exculpatory evidence under *Brady* but suppressed the letter. *See generally id.*

"A defendant's due process rights are violated when the prosecution fails to produce upon request evidence favorable to the accused 'where the evidence is material either to guilt or punishment.'" *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996) (quoting *Brady*, 373 U.S. at 87). Whether or not the prosecution acted in good or bad faith in failing to produce evidence is "unimportant in deciding whether a defendant's due process rights have been infringed." *Id.*

For Keyes to prove a *Brady* violation, he must show: (1) the prosecution suppressed the Strobel letter; (2) the letter was favorable to the defense; and (3) the letter was material to the issue of guilt. *Id.* "Whether the evidence was material depends on whether 'there is a reasonable probability that . . . the result of the proceeding would have been different.'" *Id.* (alteration in original) (citation omitted). To show a reasonable probability of a different result, the suppression of the evidence must undermine the "confidence in the outcome of the trial." *Id.* (citation omitted). We review this issue de novo. *Id.*

Keyes asserts that because the Iowa Attorney General's office has a duty to supervise county attorneys, the principles of agency law dictate that knowledge of the Attorney General is imputed to the trial prosecution team. And, because that knowledge is imputed, by withholding the Strobel letter, the county prosecutor suppressed the letter.

Iowa Code section 13.2 governs the duties of the Attorney General in relation to county attorneys:

> 1. It shall be the duty of the attorney general, except as otherwise provided by law to:
>
>> a. Prosecute and defend all causes in the appellate courts in which the state is a party or interested.
>
>> b. Prosecute and defend in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or *interested, when, in the attorney general's judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly*. The attorney general *may prosecute* a criminal proceeding on behalf of the state even if a county attorney does not request the attorney general to act as a county attorney in a proceeding under section 331.754, subsection 7.
>
>> . . . .
>
>> g. Supervise county attorneys in all matters pertaining to the duties of their offices, and from time to time to require of them reports as to the condition of public business entrusted to their charge.

(Emphasis added.)

The Iowa Supreme Court has stated, regarding this statute, in dicta, "[o]rdinarily, a criminal case is under the control of the county attorney until the supreme court acquires jurisdiction, after which it is under the sole control of the attorney general." *State v. Ohnmacht*, 342 N.W.2d 838, 841 (Iowa 1983) (citation omitted). But, if the Attorney General "feels the best

interests of the state require" the office to "prosecute and defend in all actions or proceedings, civil or criminal, before any court or tribunal," then it may intervene in a district court proceeding. *Id.* (emphasis omitted). And, as stated in section 13.2, the Attorney General may be requested to intervene in such a proceeding by "the governor, executive council, or general assembly," and does not need a specific request from a county attorney to do so.

In other words, it appears the duties of a county attorney and the Attorney General are separate until the Attorney General's office, in its discretion, chooses to become involved in a district court case, or the "governor, executive counsel, or general assembly" requests it intervene. *See* Iowa Code § 13.2(1)(b); *Ohnmacht*, 342 N.W.2d at 341–42. So, although the Attorney General indeed has supervisory authority over county attorneys, that authority extends only to ensuring the county attorney is performing their duties unless the Attorney General chooses to or is called upon to become directly involved in a case.

Keyes argues that the "prosecution team" necessarily includes both the county attorney and the Attorney General's office. *See Hamann v. State*, 324 N.W.2d 906, 914 (Iowa 1982) ("The focus is . . . the 'prosecution team,' which includes investigative units under the prosecutor's control, or agencies allied with the prosecutor in connection with the subject case."). But the court in *Hamann* examined whether testimony from two doctors employed at the Iowa Security Medical Facility was imputed to the prosecution and found it was not, even though the agency regularly worked closely with prosecutors. *See id.* at 915. ("The prosecution is not charged with knowledge of the information allegedly *undisclosed* by Dr. Loeffelholz." (emphasis added)). Here, if principles of agency law do not apply between

the Attorney General and county attorneys, so that the Attorney General is not a part of the "prosecution team," then nondisclosure of the Strobel letter to the local prosecution would not qualify as a *Brady* violation. *See id.*

We now turn to whether principles of agency law apply to the relationship between the Attorney General and county attorneys. Keyes cites to the Restatement (Second) of the Law–Agency to assert that the Attorney General is "master" of county attorneys, which thus imputes information held by the Attorney General to trial prosecution:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> > (a) the master intended the conduct or the consequences, or
> >
> > (b) the master was negligent or reckless, or
> >
> > (c) the conduct violated a non-delegable duty of the master, or
> >
> > (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) of Agency § 219 (A.L.I. 1958). Agency relationship principles as cited above do not apply to the Attorney General and county attorneys. Agency law generally requires that a fiduciary relationship exists between the agent and the principal, and that the agent agrees to act on behalf of the principal, under the principal's control. *See id.* §§ 1, 13, 14.

County attorneys have their own statutory duties which they must perform, separate from the duties of the Attorney General. *See generally* Iowa Code §§ 331.751, 331.756. Importantly, there is no fiduciary relationship

15

between the two State entities. Although the Attorney General is required to "supervise county attorneys in all matters pertaining to the duties of their offices," indicating a principal-agent relationship, no authority indicates this relationship implicates a *Brady* violation unless the Attorney General is directly involved in trial prosecution. *See* Iowa Code § 13.2(1)(g); *Hamann*, 324 N.W.2d at 909–10.

There is a circumstance recognized by our courts where knowledge of an agency separate from a county attorney's office is directly imputed to the county attorney. *See generally Harrington*, 659 N.W.2d at 522–23. The knowledge of one prosecutor "may be imputed from one government attorney to another *within the prosecutor's office*," and that the police, as a member of a different government agency, are considered a part of the "law-enforcement 'team'" within the prosecutor's jurisdiction. *Hamann*, 324 N.W.2d at 909–10 (emphasis added).

But the relationship between the police and county attorneys is distinguishable from the relationship between county attorneys and the Attorney General. *See generally Harrington*, 659 N.W.2d at 522–23. Law enforcement agencies "*within the prosecutor's jurisdiction*" are considered a part of the prosecutorial "team" presumptively, as law enforcement works with the county prosecutor throughout the pendency and trying of a case. *Hamann*, 324 N.W.2d at 910; *see generally Harrington*, 659 N.W.2d at 522–23.

So, law enforcement is presumed to be "acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). As stated above, this is not the same as the Attorney General, who only acts on the government's behalf in a criminal case at its discretion or by order of relevant government entities. *See* Iowa Code § 13.2. This imputative relationship between law enforcement and county attorneys is dissimilar to the alleged

agent-principal relationship between the Attorney General and county attorneys. Here, while the Attorney General had a statutory duty to supervise the county attorney, it did not choose to become involved in the proceedings, and thus its knowledge of the Strobel letter was not imputed to the prosecution team, especially because common law agency principles do not apply. *See id.*; Restatement (Second) of Agency § 219.

Even if we find that the Strobel letter, which states that alerts by fire investigation canines should be disregarded absent a positive laboratory test for an accelerant, was imputed to the prosecution, the letter was not suppressed as the facts were publicly available. "Publicly available information, by definition, is not suppressed." *Richter v. State*, No. 15-1800, 2017 WL 935064, at *5 (Iowa Ct. App. Mar. 8, 2017) (collecting cases). Trial counsel was in possession of an article from the International Association of Arson Investigators (IAAI) which stated in the relevant part, "Testimony regarding unconfirmed [canine] indications should be restricted . . . and should not play a part in the actual trial." This IAAI article was also included as a reference in Keyes's motion for summary judgment in this current action. At the trial in 1997, Keyes's counsel provided that same article to Agent Hiles during cross-examination, to which Hiles provided his own contrary professional opinion. The IAAI article also mentions Strobel by name, acknowledging "his substantial contributions to the development of the position of this paper." Also, in the first PCR proceeding, one of Keyes's experts, Lentini, testified that the ATF had a task force focusing on canine alert evidence, proposed its findings to the IAAI, which used those findings in the article.

Because the IAAI article confirms that Strobel's opinions were already reflected in arson-investigation trade publication, we find the facts contained

in the letter were publicly available and not suppressed. *See id.* Counsel could have utilized Strobel at the original trial, as his opinions concerning the unreliability of fire investigation canines were discoverable, and counsel appears to have presented these opinions.

And even if we determine the Strobel letter was suppressed, we are not convinced its admission at trial or the prior PCR proceeding would have created "a reasonable probability of a different result" as the facts contained in the letter do not show Hiles's opinion testimony was false and are cumulative to similar evidence already presented. *See Romeo*, 542 N.W.2d at 551.

We find the district court did not err in holding that no *Brady* violation occurred, and Keyes's due process rights were not violated.

## D.     Other Claims of Alleged False Evidence

Keyes argues the district court used an incorrect analysis on his *Napue v. Illinois* claims, citing the court's holding it was "not convinced that any of the evidence on which these arguments are based constitutes newly discovered evidence that would take the action outside the limitations period of § 822.3." *See* 360 U.S. 264 (1959). Keyes asserts the court failed to use a "nexus analysis" of the evidence, specifically with respect to "(1) Hiles' testimony regarding the alerts of his dog" and "(2) testimony Keyes was outside the house without his children." According to Keyes, these allegations were false, and their nexus to the origin and cause of the fire supports an exception to the three-year limitation.

A claim under *Napue* requires that the State knowingly used false evidence to secure a conviction and that the false testimony was material, which contradicts "any concept of ordered liberty." 360 U.S. at 269. But to

18

successfully raise a *Napue* claim under these circumstances, Keyes must show that the State knowingly provided false testimony based on newly discovered evidence to overcome the statute of limitations under section 822.3. Keyes argues the district court erred by not applying a "nexus analysis" to determine whether the evidence has a nexus to the convictions before dismissing the claim because it found the evidence was not newly discovered. *See Harrington*, 659 N.W.2d at 520 ("[T]he applicant must also show a nexus between the asserted ground of fact and the challenged conviction.").

The district court did not reach the nexus analysis because it determined the alleged facts showing the State presented false evidence were not newly discovered. While an applicant attempting to overcome the statute of limitations under section 822.3 with a ground-of-fact exception need not show that it would have probably changed the outcome of trial, they still must show the evidence is newly discovered. *See id.* at 521 ("Because Harrington asserted a relevant ground of fact or law 'that could not have been raised within the applicable time period,' this action is not time barred.").

Keyes claims that the State presented false evidence in the form of witness testimony implying that Keyes was alone in his van while the fire burned and that he ran back inside to grab two of his children only when people stopped to help. Keyes claims he did not learn of this false testimony until 2022, when he received an affidavit from an expert analyzing the incident's 911 call history. The State used this testimony to indicate that Keyes intended to kill his whole family but then attempted to save face by returning inside the house in a rescue attempt.

Keyes now asserts new evidence shows that in his 911 call recording his children can now be heard in the background, and the time of the call is

now confirmed to be the first 911 call. This evidence supposedly refutes the testimony of several witnesses who stated they did not see children in the van with Keyes initially. And Keyes argues that Agent Hiles's testimony was false because of new evidence disputing the reliability of fire investigation canines.

This alleged false evidence has been available since trial in 1997. Keyes could have analyzed the 911 recording at his previous PCR proceeding or earlier. Keyes does not explain why he could not have discovered these facts previously. The facts that his expert analyzed and prepared in their affidavit were available immediately after trial. Keyes has not fulfilled his burden to prove this evidence is newly discovered to overcome the three-year statute of limitations under section 822.3. The same analysis applies to Keyes's assertion that Hiles's testimony was false, as facts supporting its alleged falsity were discoverable during and after trial.

Nor has Keyes raised a genuine issue of fact as to whether the prosecution was aware the evidence was false. *See Napue*, 360 U.S. at 269. Keyes simply asserts that the Strobel letter and the 911 recording were contradictory to some testimony, not that the State possessed knowledge of false evidence. *See id.* But in any event, we agree with the district court that even if a genuine issue of material fact exists as to whether the witnesses' testimony was false, Keyes could have discovered these facts earlier. So, on this issue, Keyes has not overcome the statute of limitations under section 822.3, and his *Napue* claim fails.

### E. Ineffective Assistance of Counsel

Keyes next claims that his counsel was ineffective at both his criminal trial and first PCR proceeding by failing to present evidence of developing changes in fire investigations, some of which did not exist at the time of trial.

Keyes already asserted ineffective assistance of counsel claims in his prior PCR action. *See Keyes*, 2017 WL 1086781, at \*4–5. We need not reach the merits of this claim as it is time-barred by section 822.3: "[a]n allegation of ineffective assistance of counsel in a prior case under this chapter shall not toll or extend the limitation periods in this section nor shall such claim relate back to a prior filing to avoid the application of the limitation period." Procedendo in Keyes's previous PCR action was issued in 2017, so this claim is asserted outside the limitations period. *See id.*

### III.   Conclusion

For the above reasons, we affirm the district court's ruling in favor of the State's motion for summary judgment. We agree there is no genuine issue of material fact regarding whether Keyes has proven actual innocence or whether there exists newly discovered evidence to overcome the applicable statute of limitations.

**AFFIRMED.**