**UNITED STATES of America, Appellee,**

v.

**Thomas W. TIERNEY, Appellant.**

No. 89–2479.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 10, 1990.

Decided Oct. 17, 1991.

Rehearing and Rehearing En Banc
Denied Dec. 23, 1991.

Willard B. Bunch, Kansas City, Mo., for appellant.

Robert E. Lindsay, Washington, D.C., for appellee.

Before McMILLIAN, Circuit Judge, ROSS, Senior Circuit Judge, and STUART,* Senior District Judge.

* The Honorable William C. Stuart, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

McMILLIAN, Circuit Judge.

Thomas W. Tierney ("defendant") appeals from a final judgment entered in the United States District Court[1] for the Western District of Missouri upon a jury verdict, finding him guilty of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1988), and fifteen counts of assisting in the preparation of materially false income tax returns in violation of 26 U.S.C. § 7206(2). The district court sentenced him to three years in prison, a $10,000 fine, payment of the costs of prosecution, and two years of probation. For reversal, defendant argues that (1) the district court erred in denying certain motions, (2) the district court should have quashed the indictment because the prosecutor acted under a conflict of interest, (3) his conviction was not supported by sufficient evidence, (4) the district court erroneously provided the jury with an incomplete exhibit, and (5) the district court should have directed a mistrial due to jury misconduct. For the reasons stated below, we affirm the judgment of the district court.

## I.

Between 1981 and 1984, defendant served as general counsel of the Midwestern Companies, Inc. ("Midwestern"). Between 1983 and 1984, he also served as a director of Midwestern. In 1982, Titan Energy Engineering, Inc. ("Titan"), a subsidiary of Midwestern, built and sold four ethanol plant facilities in New Mexico (known as "Clovis I through IV") to partnerships as tax shelters. Under Internal Revenue Service (IRS) regulations, the partners could not take advantage of relevant tax credits unless, inter alia, they provided documentation that the plants were "placed in service" by the end of 1982. See 26 C.F.R. § 1.46–3(d) (1991). The parties' versions of all other relevant facts differ dramatically.

The federal government (or "the government") claims that, in December 1982, defendant, Ronald Walker, Midwestern's ex-ecutive vice-president, and Tom Jackson, a pilot and administrative assistant, visited the plants three times and observed that they were not operational. Defendant also drafted letters to the IRS certifying the plants as operational, which Paul Liscom (a independent chemical engineer hired to inspect the plants) was expected to sign after visiting the plants.

On December 29, 1982, Liscom inspected the plants and discovered that the plants were still under construction and that none of the plants was ready to produce ethanol. After completing his inspection, Liscom visited Larry Kruzie and Ken Sinks, two of Titan's cofounders, at Kruzie's house. Sinks gave Liscom the certification letter drafted by defendant and asked Liscom to sign it. Liscom refused to do so, because the plants were not operational. Sinks then telephoned Walker, who allegedly brought defendant into a conference call. Sinks and Liscom testified that defendant told Liscom that the plants were technically operational within the meaning of IRS regulations. Liscom testified that he then agreed to sign the certificates, on the condition that defendant create a glossary explaining his definitions of relevant terms and attach the glossary to the certificates. After the glossaries were prepared, Liscom signed the certificates. By contrast, Walker testified that Liscom prepared the glossaries and that defendant merely approved them.

In January 1983, defendant, Walker, and Carl Baron, one of Midwestern's accountants, visited New Mexico to see a demonstration of one of the plants. Walker later testified that the demonstration was a complete failure. In February 1983, defendant, Walker and Carl Wright, Midwestern's secretary-treasurer, allegedly decided not to inform the partnerships that the plants were incomplete and to prepare partnership tax returns falsely claiming tax credits. They also allegedly decided to leave a "paper trail" giving the appearance that the plants were complete, by backdating 1983

---

**1.** The Honorable Howard F. Sachs, Chief Judge, United States District Court for the Western District of Missouri.

bills as 1982 bills and classifying construction work as repair work.

In March 1983, the Curry County, New Mexico, district attorney investigated Midwestern, because Midwestern had built the plants with industrial revenue bonds, and the district attorney was concerned about possible misuse of bond funds. Based on defendant's assurances that bond funds had been properly spent, the district attorney closed his investigation. In the fall of 1983, the district attorney reopened the investigation, because Midwestern had failed to provide information about its expenditures. Defendant was eventually convicted in a New Mexico state court of fraud, conspiracy to commit fraud, criminal solicitation and racketeering.

By contrast, defendant claims that the government's witnesses committed perjury, and that he did not participate in the preparation of the partnerships' 1982 tax returns. Defendant also denies visiting the ethanol plants in December 1982 and denies that he participated in the December 29, 1982, conference call. Defendant also claims that even if he was involved in the 1982 certification, he believed in good faith that the plants were "placed in service" as defined by IRS regulations. In this context, defendant notes that the regulations were ambiguous and alleges that by the end of 1982 the plants had begun to produce some ethanol.

Finally, defendant denies committing any acts of fraud in 1983. For instance, defendant claims that his co-workers were to blame for any fraudulent billing, and for any alleged misrepresentations made to the government officials.

In 1987, defendant, Walker, Wright and Sinks were indicted. The indictment charged defendant with securities fraud, insider trading, overvaluation of assets, conspiracy to defraud the United States, and aiding the preparation of false tax returns. Specifically, the government claimed that defendant had repeatedly attempted to mislead the IRS by falsely claiming that the ethanol plants were "placed in service" at the end of 1982 and by overvaluing the plants.

Shortly thereafter, defendant moved to quash the indictment, based on an alleged conflict of interest by the prosecutor. The district court denied this motion. *See United States v. Tierney*, No. 87–00007–01/04/CR–W–6 (W.D.Mo. Mar. 18, 1987) (*Tierney I*). After a three-week jury trial, the district court entered a directed verdict for defendant on the issue of overvaluation. The jury then acquitted defendant of all securities-related offenses and convicted him of conspiracy to defraud the United States and fifteen counts of assisting in the preparation of false tax returns.

Defendant then appealed his conviction to this court. Shortly after oral argument, defendant filed a motion for a new trial, based on newly discovered evidence. As a result, we dismissed defendant's appeal without prejudice and remanded to the district court for consideration of defendant's motion. *See United States v. Tierney*, No. 88–1111WM (8th Cir. Feb. 13, 1989). The district court denied the motion and a subsequent motion for reconsideration. *See United States v. Tierney*, No. 87–00007–01–CR–W–6 (W.D.Mo. Aug. 1, 1989) (*Tierney II*) (order denying motion for new trial); *United States v. Tierney*, 718 F.Supp. 748 (W.D.Mo.1989) (*Tierney III*) (order denying motion for reconsideration). This appeal followed.

## II.

On appeal, defendant argues that (1) his motions for a new trial and for reconsideration should have been granted, (2) the prosecutor labored under a conflict of interest, (3) his conviction was not supported by sufficient evidence, (4) a partial copy of § 1.46–3(d) was inappropriately submitted to the jury, and (5) he was denied due process because of jury misconduct. Each of these issues will be addressed in turn.

### A.

■ In his motion for a new trial, defendant alleged that newly discovered evidence proved that his conviction was obtained by the prosecution's negligent use of perjured or erroneous testimony. Specifi-

cally, defendant challenges (1) various witnesses' testimony regarding the December 29, 1982, conference call and (2) testimony by Jackson and Walker alleging that defendant was present at the ethanol plant sites in December, 1982.[2] Each issue will be addressed below.

### 1.

As noted above, several government witnesses claimed that on December 29, 1982, defendant participated in a conference call with Sinks, Walker, Liscom and Larry Skelley, the general contractor who built the plants. In the conference call, defendant allegedly persuaded Liscom to sign certificates which falsely described the ethanol plants as operational, and which included a glossary redefining relevant terms. By contrast, defendant testified that he did not participate in the December 29 conference call at all. Thus, the government witnesses' testimony damaged defendant's credibility and established that defendant was aware that the plants were not yet operational under a dictionary definition of that term.

Fifteen months after trial, defendant discovered Walker's telephone billing records in a repository used by a law firm in related civil litigation. These records revealed that "no call from Walker to Tierney in Kansas City was billed to the Walker home telephone number," *Tierney II*, slip op. at 6. Defendant accordingly moved for a new trial on the basis that the telephone records showed that he did not participate in the December 29 call. The district court denied the motion because the December 29 call could have been billed to Walker's office number. *Id.*

Shortly thereafter, defendant discovered Walker's office telephone records, which revealed that no calls made to defendant had been billed to that office on December 29, 1982. Defendant accordingly moved for reconsideration on the ground that the

telephone records clearly established perjury by government witnesses. The district court assumed that "this new material does indeed show it is improbable ... that defendant had the conference call," *Tierney III*, 718 F.Supp. at 749, but nevertheless denied the motion because the government witnesses' testimony might have constituted "tangled recollections" rather than perjury. *Id.* at 752. The district court added in dicta that even if the government witnesses' testimony was perjured, the prosecutor's use of such testimony was innocent rather than negligent. *Id.* at 752 n. 6. The district court also suggested that in the absence of perjury, a new trial is appropriate only if newly discovered evidence "will likely result in an acquittal" on retrial. *Id., citing United States v. Begnaud*, 848 F.2d 111 (8th Cir.1988) (*Begnaud*). The district court found that defendant had not shown that an acquittal on retrial was likely and accordingly denied the motion.

On appeal, defendant argues that (1) the government witnesses' testimony regarding the December 29 telephone call was perjured, (2) the prosecutor's failure to discover the perjury was negligent rather than innocent, and (3) under any legal standard, he has shown sufficient prejudice to obtain a new trial. For the reasons stated below, we reject all three arguments.

### a.

■ As noted above, the district court doubted that defendant actually participated in the December 29 conference call. *See Tierney III*, 718 F.Supp. at 749. The district court nevertheless held that "[d]efendant's charge of perjury unduly discounts the vagaries of human recollection," *id.* at 752, and that perjury was less likely than "tangled recollections, confusion in reconstructing memories, miscommunication, and the like." *Id.* In support of this conclusion, the district court noted that Walker and Liscom disagreed as to whether

---

**2.** Defendant also claims that his federal prosecution violated the Justice Department's own policy restricting dual prosecutions by state and federal government. *See Petite v. United States,* 361 U.S. 529, 531, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960) (noting that government has general

policy "against duplicating federal-state prosecutions"). However, it has been held that defendants may not invoke the *Petite* policy to bar federal prosecution. *See United States v. Robinson,* 774 F.2d 261, 275 (8th Cir.1985) (citations omitted).

defendant was solely responsible for the glossary. Liscom testified that defendant drafted the glossary and convinced him to sign it, while Walker testified that Liscom drafted the glossary and that defendant merely approved it. *Id.* at 750. The district court accordingly reasoned that if Walker and Liscom had planned to commit perjury, Walker would have "adopt[ed] the more incriminating version of the conversation offered by Liscom." *Id.* at 752. Moreover, Walker may have merely quoted defendant's legal opinion to Liscom instead of bringing defendant into the conference call, thereby causing Liscom to become "confused, years after the fact, into thinking he had talked to [defendant] on the telephone." *Id.*[3]

On appeal, defendant claims that the district court' scenarios were speculative and unsupported by the evidence, for four reasons.

First, defendant claims that no reasonable fact-finder could expect several government witnesses to "believe that a telephone conversation which never occurred had taken place." Brief for Appellant at 19. We disagree. As the district court suggested, Walker could have told Liscom that defendant had endorsed the plant certifications as modified by the glossaries and, over time, the parties could have come to believe that Liscom had in fact spoken to defendant, instead of merely hearing his name used as an authority by Walker.

Second, defendant argues that he could not have drafted the glossary before speaking to Liscom, because he did not know what Liscom would have said about the plants. If, as we assume, defendant was aware that the plants were not operational in the dictionary sense of the term, he probably would have known that Liscom would discover this fact. Thus, defendant

also knew which terms had to be redefined (*e.g.*, terms such as "in service" and "operational") and could have drafted a glossary of redefinitions before speaking with Liscom.

Third, defendant notes that he received no calls from Walker's home during the two weeks preceding and following December 29, and therefore could not have plotted to redefine relevant language. However, defendant could have talked with Walker while Walker was at his office. Thus, this argument also lacks merit.

Finally, defendant claims that a New Mexico state court recently held that the prosecution witnesses' testimony about the December 29 call was perjury and warranted reversal. Because the relevant New Mexico opinions are not reported or otherwise available to the court, we cannot tell if defendant has correctly described the state court's holding. Accordingly, we reject this argument (albeit without prejudice to defendant's most recent motion for a new trial before the district court, which allegedly addresses this question).

In sum, we hold that the evidence presented at trial supports the district court's inference that the government's witnesses' testimony about the December 29 conference call constituted innocent error, rather than perjury. Because defendant does not contend that such innocent error warrants a new trial, we hold that the district court did not abuse its discretion in denying the motion for new trial based on newly discovered evidence regarding the December 29 conference call.

**b.**

■ The government's use of the testimony, even if perjured, was innocent rather than knowing, reckless or negligent. When the court finds that the government knowingly, recklessly or negligently used

---

**3.** In addition, the government speculates that its witnesses' testimony was actually true, because even if they talked to defendant, they might have "forgot[ten] exactly where defendant and Walker were when they were reached by phone." Brief for Appellee at 20–21. If Walker had called defendant on the night of December 29, the call would presumably have been billed to either Walker's home or his office, even if Walker had been at a third location. Moreover, telephone records reveal that Walker called Kruzie from his home. Thus, the witnesses' opinions as to Walker's location are simply irrelevant, and the government's argument is without merit.

the false testimony, the less stringent new trial standard applies. That standard only requires the defendant to show "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (*Agurs*), *cited in United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985) (*Bagley*). In contrast, when the government innocently uses false testimony, the defendant must establish that an acquittal would probably result on retrial. *Begnaud*, 848 F.2d at 113–15.

Here, the district court found that the government innocently used false testimony. *Tierney III*, 718 F.Supp. at 752 n. 6. We have reviewed the record and determined that this finding is not clearly erroneous.

### c.

■ In addition, we hold that even if the government negligently used perjured testimony, a new trial would be inappropriate. Defendant admits that even where the government has negligently or knowingly used perjured testimony, a new trial is necessary only if the defendant shows "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3382. We believe that the "reasonable likelihood" requirement has not been met by defendant. Defendant notes that relevant IRS regulations are highly technical and claims that he honestly believed that the ethanol plants were sufficiently "operational" to qualify for tax credits. *See* Brief for Appellant at 41–45. Thus, defendant's alleged preparation of the glossary on December 29 is as consistent with a diligent attempt to comply with the letter (if not the spirit) of the tax laws as it is with a criminal conspiracy to evade those laws. It logically follows that the government witnesses' testimony that defendant participated in the December 29 conference call was immaterial to his guilt or innocence, and that the government witnesses' perjury on this issue was unimportant.

Defendant argues that testimony regarding the December 29 call was material, for three reasons. First, defendant argues that the disagreement between him and four government witnesses "effectively made him out as a liar for all purposes in the minds of the jury." Brief for Appellant at 11. As noted above, the government disagrees with defendant as to virtually every relevant fact. Thus, the credibility conflict regarding the December 29 conference call is just one of many, and the testimony regarding the conference call did not cause substantial prejudice. Second, defendant claims that the New Mexico courts overturned his conviction based on the evidence at issue. As noted above, the New Mexico court's alleged opinion is not reported and has not otherwise been made available to this court in any way. Accordingly, we reject defendant's argument without prejudice to defendant's recent motion for a new trial, filed on August 3, 1990, which addresses this issue. Third, defendant argues that even the district court admitted that the allegedly perjured testimony was dispositive. In support of this theory, he cites two statements by the district court. First, defendant notes that in its order denying defendant's motion for reconsideration, the district court found that the testimony at issue increased the chances of acquittal from 10% to at least 30%. *Tierney III*, 718 F.Supp. at 751. For the reasons stated above, we believe the district court was wrong as to the materiality of the testimony. Second, defendant relies on the district court's order denying his motion for a judgment of acquittal. Defendant interprets that order to mean that the testimony regarding the December 29 conference call "was so critical to the government's case that it must necessarily have been accepted by the jury in order to convict." Reply Brief for Appellant at 15. In fact, the district court stated that "[a] New Mexico jury has found against [defendant], and the jury in this case almost necessarily accepted what seems to be the most damaging evidence against defendant. While the court is not a fact-finder it must be observed that the legalistic sleight of hand strongly indicates participation of a

lawyer." Designated Record on Appeal at 628. We interpret this statement to mean only that the district court accepted Liscom's testimony, not that the district court believed such testimony to be crucial to the jury's verdict.

In sum, we hold that defendant's newly discovered evidence regarding the December 29 conference call does not require a reversal of the district court's order denying his motions for a new trial and for reconsideration, because (1) it is not clear that perjury occurred and (2) even under the stringent *Agurs* test, the witnesses' alleged perjury was not sufficiently material to require a new trial. Accordingly, we hold that the district court did not abuse its discretion in denying the motion for a new trial as to this issue, without addressing the factual dispute as to whether the government's failure to uncover the witnesses' alleged perjury was negligent (requiring application of *Agurs*) or innocent, or the legal dispute over what standard should be applied if the prosecution innocently failed to discover its witnesses' perjury. *See Tierney III*, 718 F.Supp. at 751 (citations omitted) (noting that some courts hold that "innocent use of perjured testimony" requires new trial if there is "any reasonable likelihood that false testimony affected judgment of the jury" while others hold that new trial necessary only if acquittal on retrial probable).[4]

### 2.

At trial, Jackson and Walker testified, based on Jackson's flight records, that they had flown with defendant to Clovis to visit the plants on three separate occasions in December 1982. Jackson and Walker further testified that the plants were obviously incomplete at the time of their visits and that adverse weather conditions rendered Titan's construction equipment inoperable. By contrast, defendant denied having visited the plants at all in December 1982. After trial, defendant discovered travel records (such as reimbursement requests and expense vouchers) showing that Walker and Jackson did not visit Clovis at all during the month of December 1982. Defendant accordingly alleged in his motion for a new trial that Jackson's records "were demonstrably incorrect and probably falsified by the witness," *Tierney II*, slip op. at 1.

Instead of addressing the issue of perjury, the district court applied the five-part test generally applicable to a motion for new trial on the basis of newly discovered evidence. Under this test, a motion may be granted only if (1) the evidence is in fact newly discovered, (2) the movant has shown due diligence, (3) the new evidence is not "merely cumulative or impeaching," (4) the new evidence is material to relevant issues, and (5) on retrial, "the newly discovered evidence would probably produce an acquittal." *Begnaud*, 848 F.2d at 113 (citations omitted). The district court held that only the first of these requirements has been met. Defendant argues that the district court should have (1) found perjury and (2) granted the motion for a new trial even in the absence of perjury.

### a.

■ Defendant asserts that the district court should not have applied *Begnaud*, because Jackson's testimony constituted perjury rather than inadvertent error. We reject this contention for two reasons. First, defendant admits that he did visit the ethanol plants and observed that working conditions were extremely adverse, but claims that his visits occurred in August or September rather than December. Brief for Appellant at 21. Thus, it is possible that Jackson and Walker remembered defendant's visit to the plants, but were merely confused as to the date of the visit. Second, defendant's claim that Jackson and Walker "have admitted by affidavit and testimony in subsequent New Mexico proceedings that this testimony was false," Reply Brief for Appellant at 6 n. 8, is

---

4. However, we note in passing that this circuit may have resolved this dispute in *United States v. Widgery*, 674 F.2d 710, 712–13 (8th Cir.) ("any reasonable likelihood test" appropriate only if prosecution knowingly used perjured testimony), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). The Supreme Court apparently has not addressed this issue.

wholly without support in the appellate record or in any reported case, and is the subject of yet another motion for a new trial presently pending in district court. It would be inappropriate to address the perjury issue before the district court has done so. We therefore assume for the purposes of the present appeal that Jackson's testimony regarding the December visits, as well as Walker's corroborating testimony, constituted inadvertent error rather than perjury.

b.

■ Defendant next argues that the district court applied the *Begnaud* standard incorrectly. Specifically, defendant contends that (1) he has shown due diligence, (2) the travel records were not "merely cumulative or impeaching," and (3) the travel records would probably produce an acquittal on retrial.

The district court found that defendant negligently failed to uncover relevant travel records, because the records were available before trial in the Securities and Exchange Commission's files, or possibly in files compiled by the law firm of Blackwell, Sanders, Matheny, Weary and Lombardi ("Blackwell Sanders"), which represented Midwestern's insurer in a suit against defendant. *Tierney II*, slip op. at 2. The district court further noted that although defendant had moved for a continuance to present additional discovery, he had not presented the district court with a list "of incomplete investigation that would have included, for example, the ... [travel] records, which might have supported a request for a continuance of some months." *Id.* at 3. Finally, the district court added that the prosecutor's failure to obtain the travel records was not negligent or reckless, because the prosecutor had less time than defendant to search for the travel records.

Defendant argues that his failure to discover the travel records before trial was excusable, for two reasons. First, defendant claims that he could not have discovered the travel records before trial, because (1) the documents were part of a 400,000-page document repository which he did not have time to examine document by document and (2) he could not have compiled a "laundry list" discovery request before he was aware of the travel records' existence. The government asserts, and defendant admits, that he had access to the repository prior to trial. In *United States v. Widgery*, 674 F.2d 710 (8th Cir.) (*Widgery*), cert. denied, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982), the defendant uncovered evidence after trial that a prosecution witness had perjured himself, and claimed that he nevertheless met the requirement of due diligence because, *inter alia,* "the case was extremely complex." *Id.* at 713. We disagreed, holding that "[t]he evidence and arguments presented tend to show that the material now relied upon could have been discovered prior to trial with due diligence." *Id.* Defendant in this case, like the defendant in *Widgery,* essentially claims that this case was so complex, and the documentary record so immense, that his failure to uncover the travel records before trial is excusable. Thus, *Widgery* is on point, and defendant's claim that he exercised adequate diligence must be rejected.

Second, defendant argues that he exercised due diligence because his failure to discover the documents was caused by the government's omnibus representation that the repository contained no exculpatory evidence. The district court rejected this argument because the prosecutor's failure to obtain the records "occurred during a period of several weeks ... defendant's failure to uncover the same additional documentation continued for more than 18 months rather than a few weeks." *Tierney II,* slip op. at 4.

On appeal, defendant reiterates his claim that the government negligently breached its constitutional duty to disclose exculpatory evidence, based on the government's admission that prosecutors "spent a minimal amount of time reviewing records at the repository," Brief for Appellee at 22, and the government's failure to discover Jackson's diary, which Jackson discussed at defendant's New Mexico trial (and which apparently contradicted his testimony).

We disagree. It is well settled that there is no "affirmative duty upon the government to take action to discover information which it does not possess." *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir.1975), *cert. denied,* 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976). For instance, in *Reese v. Frey,* 801 F.2d 348 (8th Cir.1986) (per curiam) (*Reese* ), a defendant who challenged his warrantless arrest found an arrest warrant in the court file after trial, and argued that the warrant constituted exculpatory evidence which should have been disclosed by the prosecutor. We held that even if the defendant had asked the prosecutor for the warrant, the prosecutor's conduct was not culpable because "the court file in which the warrant was found was readily available to [the defendant] and his attorney, and it can hardly be said that the prosecutor suppressed the warrant or failed to disclose its existence." *Id.* at 350. *See also United States v. Dunn,* 851 F.2d 1099, 1101 (8th Cir.1988) ("the government has no affirmative obligation to discover potentially exculpatory information which it neither possessed nor of which it was aware"), *citing United States v. Chen,* 754 F.2d 817, 824 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). Based on *Reese* and similar cases, we hold that even if the defendant has requested evidence from the government, the government has no affirmative duty to disclose evidence where, as here, it is not aware of the evidence, and the evidence is readily accessible to the defendant. It logically follows that defendant's negligent failure to discover evidence of Jackson's travel records is not excused by the prosecution's failure to discover that evidence.

Accordingly, we hold that defendant's failure to discover the travel records arose out of his own negligence. Thus, defendant has not satisfied the "due diligence" requirement of *Begnaud.*

Even if defendant had demonstrated due diligence, we doubt that admission of the travel records would probably produce an acquittal on retrial, given the nature of defendant's theory of the case. As noted above, defendant contends that he honestly believed that even if the plants were incomplete under a common sense definition of terms such as "in service" and "complete", they were complete under the technical definitions of the tax code. Jackson's testimony regarding the Clovis visits would have proved only that defendant knew that the plants were not complete under the common sense definition, and therefore does not contradict defendant's "attempted technical compliance" theory. Furthermore, defendant concedes that he visited the plants earlier in 1982, and was aware that they were not complete. We therefore hold that the jury would probably have inferred that defendant knew that the plants were not operational at the end of 1982, even if he did not actually visit the plants in December of that year.

In sum, we hold that defendant's attack upon the Jackson and Walker testimony regarding the December 1982 plant visits fails to satisfy two elements of *Begnaud:* defendant's delay in discovering the evidence was not compellingly excusable, and its exclusion would probably not produce an acquittal on retrial. Accordingly, we hold that the district court did not abuse its discretion in denying defendant's motion for a new trial on this issue, without reaching the merits of the district court's holding that defendant's newly discovered evidence that he did not visit Clovis in December 1982 "was simply additional impeachment," *Tierney II,* slip op. at 3.

B.

Before trial, defendant moved to quash the indictment, on the basis that the prosecutor's husband had a financial interest in the case. *See* 18 U.S.C. § 208(a) (government employee may not participate in matter in which spouse has a financial interest); 28 C.F.R. § 45.734–4 (prohibiting Justice Department employee from participating in a prosecution if he or she has a personal relationship with anyone with "a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution"); Fed. R.Crim.P. 6(d). The prosecutor's husband

was a partner in a law firm representing defendant's insurer, and the insurer has sued defendant for a declaratory judgment rescinding defendant's liability insurance policy. Although the prosecutor's husband did not participate in the case, defendant nevertheless reasons that because defendant's alleged dishonesty might bar recovery under the insurance policy, the insurer and its law firm would benefit from a guilty verdict. The district court agreed that the insurer would benefit, but found that because the husband's law firm was paid on a hourly basis, it would not benefit from a guilty verdict, and the husband's interest as a partner in the firm was therefore too "remote and speculative" to implicate either § 208 or Justice Department regulations. The district court noted in passing, however, that "a somewhat different standard would be applied if a judge had a spouse or relative who was a partner in a law firm engaged in litigation before the judge." *Tierney I,* slip op. at 4 n. 1 (citations omitted).

On appeal, defendant relies on numerous cases holding that a judge should disqualify himself or herself if he or she has a spouse or relative who is a partner in a law firm engaged in litigation before the judge. *See Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir.) *(Potashnick),* cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir.1977) *(SCA).* Defendant also cites a statute governing judicial recusals. *See* 28 U.S.C. § 455.

■ These cases do not apply because the courts may "require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists." *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 811, 107 S.Ct. 2124, 2139, 95 L.Ed.2d 740 (1987) *(Young)* (plurality) (Brennan, J.). *See also Marshall v. Jerrico, Inc.,* 446 U.S. 238, 250, 100 S.Ct. 1610, 1617, 64 L.Ed.2d 182 (1980); *Dick v. Scroggy,* 882 F.2d 192, 197 (6th

Cir.1989) *(Dick)* (citations omitted) (noting that a financial interest that would disqualify a judge may be "too remote and insubstantial" to disqualify prosecutor).

■ Defendant argues, however, that even under the relatively demanding standard established by *Young* and similar cases, the prosecutor's husband had a substantial financial interest in a guilty verdict. In support of this theory, defendant argues that even partners in a firm which bills clients by the hour have an interest in winning a suit, because the firm's reputation (and thus each partner's income) benefits from victory. Although such partners may have an interest in prevailing, we believe that this interest is simply too insubstantial to require disqualification of a partner's spouse in related litigation.[5] Accordingly, we endorse the district court's denial of defendant's motion to quash.

### C.

Defendant next argues that his conviction was not supported by the evidence, because the government failed to carry its burden of proving that he was motivated by criminal intent, rather than an honest misinterpretation of the tax code. In response, the government relies on (1) expert testimony attacking defendant's interpretation of the tax code, (2) testimony that defendant urged Walker to pay Skelley a completion bonus although the plant was not complete, (3) testimony that defendant had falsely described warranty work as construction work, and (4) testimony that defendant knew the partnerships' tax returns were false and encouraged Wright to falsify them. *See Tierney III,* 718 F.Supp. at 750 (describing testimony regarding completion bonus and warranty work as "dramatic" evidence of defendant's intent but noting that they "suffer a problem of indirect, remote, or nonexistent relationship" to preparation of falsified tax returns).

---

5. Defendant also argues that if a conflict of interest existed, we must reverse the conviction without considering whether the district court's error was harmless. Because we find no substantial conflict of interest, we need not address this question.

### 1.

Under § 1.46–3(d), the ethanol plants were not eligible for tax credits unless they had been "placed in service" by the end of 1982. 26 C.F.R. § 1.46–3(d)(2) defines "placed in service" as "in a condition or state of readiness and availability for a specifically assigned function".

The government argues that defendant could not have reasonably believed that the plants were "placed in service" by the end of 1982, because the plants were not ready to produce ethanol by the end of 1982. In support of this conclusion, the government relies on the testimony of David Buchmueller, an IRS group manager specializing in regulations relating to tax shelters, who stated that the plants were not "placed in service" or ready to produce ethanol by the end of 1982. Similarly, Wright testified that to be "placed in service," the plants had to be "in the state of readiness so that you could, in effect, start them up and they would produce ethanol." Brief for Appellee at 42. The government also relied on testimony by Skelley and Sinks, who alleged that the plants were not capable of producing ethanol at the end of 1982. Finally, the government relies on defendant's own testimony that the plants were "placed in service" only if they were "capable of producing ethanol." Brief for Appellee at 43.

■ In response, defendant makes three arguments. First, defendant notes that Buchmueller and Wright (the only government witnesses familiar with tax law) had never seen the plants and that the other government witnesses did not have sufficient tax expertise to judge whether the plants were "placed in service" as defined by § 1.46–3(d). Admittedly, the testimony of either group of witnesses alone might not be particularly useful. However, we hold that the jury could have ascertained whether the plants were "placed in service" by combining the non-expert witnesses' factual testimony regarding the plants' capabilities with the expert witnesses' testimony applying the law to such factual testimony.

■ Second, defendant argues that the plants were in fact "placed in service" by the end of 1982, because even though they were not fully complete they were capable of producing some ethanol by the end of 1982. We reject defendant's interpretation of § 1.46–3(d). In our opinion, property is in a "state of readiness and availability for a specifically assigned function" only if it is productive on a fairly consistent basis. *See In re Mitchell*, 109 B.R. 434, 438 (Bkrtcy.W.D.Wash.1989) (electrical plant not "placed in service" unless it "has gone into ordinary daily operation."), *aff'd*, 1990 WL 142016 (W.D.Wash. Aug. 31, 1990). For instance, if a consumer buys an automobile, that automobile is not in a "state of readiness" if it can be driven at only 10 miles an hour for only 3 miles at a time. We believe by the end of 1982 that the ethanol plants were no more "ready" than was our hypothetical automobile, based on Skelley's testimony that various parts which needed to be "hooked up" for ethanol to be produced were not "hooked up" by December 1982, Addendum to Appellant's Brief at 14–15, Sinks's testimony that the plant could produce ethanol but not "in any appreciable amount", *id.* at 22, and Liscom's testimony that only a couple of gallons of ethanol could have been produced. *Id.* at 24. Thus, we hold that defendant's interpretation of the tax code was incorrect, and indeed was so egregiously wrong that the jury could reasonably have inferred criminal intent.

Third, defendant argues that where the defendant's interpretation of an ambiguous regulation is at issue, the government has the burden of proving that defendant's actions were "motivated by something other than misunderstanding, honest inadvertence, or mistake." Reply Brief for Appellant at 20. *See United States v. Steinhilber*, 484 F.2d 386, 390 (8th Cir.1973) (where defendant is accused of willfully misinterpreting ambiguous language, government has burden of negating the defendant's claim of honest error) (citation omitted); *Johnson v. United States*, 410 F.2d 38, 45 (8th Cir.) ("it is incumbent upon the Government to negative any reasonable interpretation that would make the defen-

dant's statement factually correct."), *citing United States v. Diogo*, 320 F.2d 898, 907 (2d Cir.1963), *cert. denied*, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). As noted above, we hold, based on the plain language of § 1.46–3(d) and on testimony regarding the condition of the ethanol plants in December 1982, that a reasonable jury could have found that defendant's misstatements of fact were willful. In other words, we hold that if defendant conspired to suggest that the plants met IRS requirements, sufficient evidence exists to support the government's claim that defendant conspired to commit tax fraud.

Defendant argues, however, that even if § 1.46–3(d) is unambiguous, he did not participate in a conspiracy to violate it. Thus, we must go on to address the government's evidence of conspiracy.

### 2.

■ The government initially relies on testimony regarding Skelley's completion bonus. According to the government, Midwestern agreed to pay Skelley a $40,000 "completion bonus" if the plants were capable of producing ethanol by the end of 1982. In January 1983, Skelley approached Walker in the Clovis airport and requested payment of a $40,000 completion bonus, because Walker had been telling the public that the plants were complete. Walker allegedly refused to pay Skelley, because the plants were not complete. Defendant then allegedly told Walker never to make such statements, because they could not publicly take the position that the plants were incomplete. Shortly thereafter, Skelley was allegedly paid $40,000 on defendant's instructions. The government interprets these facts to mean that defendant knew that the plants were not complete, but nevertheless directed the payment of a completion bonus to mislead the IRS and the general public.

Defendant claims that Skelley's agreement with Midwestern, as amended by an oral agreement, provided that the bonus would be payable when the plants produced ethanol, regardless of when the production was achieved. Thus, defendant contends

that he was merely trying to make Walker live up to his agreement with Skelley. Defendant further claims that he did not urge Walker to pay the bonus, but merely "advised him that that was not the time or place for him to be getting into a discussion with Skelly [sic] as to whether the plants were fully complete", Reply Brief for Appellant at 16. Finally, defendant claims that Walker did not pay the bonus until the plants had begun to produce ethanol, and that defendant therefore had no role in directing that the bonus be paid.

For the purposes of this appeal, the key question is what defendant said to Walker. If he merely told Walker that the issue of completion should be addressed at another time, the confrontation between Skelley and Walker is obviously irrelevant to defendant's guilt or innocence. On the other hand, if (regardless of the terms of the agreement) defendant told Walker that even if the plant was incomplete, Walker should not acknowledge this fact, the jury could reasonably have found that he conspired with other Midwestern and Titan officials to falsely represent that the plant was "placed in service."

As defendant admits, Skelley's testimony corroborates the government's version of the facts. Reply Brief of Appellant at 16. *See also* Transcript of Proceedings at 1174 ("Transcript"). Thus, we hold that a reasonable jury could have found that defendant urged Walker to pay the bonus even though the plants were not complete at the time of the conversation.

Defendant argues that even if he tried to help Skelley get the completion bonus, his recommendation that the bonus be paid was not followed until the plants had actually produced a substantial amount of ethanol. However, Skelley admitted at trial that he was paid the bonus shortly before production began, Transcript at 1175. Thus, the jury could reasonably have inferred that the bonus was paid due to defendant's influence and that defendant had sufficient influence to be a member of the conspiracy among Midwestern's staff.

The jury's finding that defendant was a member of the conspiracy is also supported

by Walker's testimony that defendant discouraged him from disclosing Titan's failure to complete the plants. Walker testified that he wanted to tell the partners in the ethanol plants that the plants were incomplete. However, defendant told Walker that such disclosure "would be a stupid and dangerous thing to do," Transcript at 289.

Defendant does not address this testimony at all, but merely attacks other testimony by Walker regarding the difference between warranty and construction costs. *See* Reply Brief for Appellant at 18. Walker's testimony was highly persuasive, and we therefore hold that defendant's conviction was supported by sufficient evidence. We therefore need not address the relevance of Wright's testimony about defendant's complicity, or of defendant's alleged attempts to classify warranty work as construction work.

### D.

■ At trial, § 1.46–3(d) was submitted to the jury as an exhibit. The district court did not give the complete regulation to the jury, but only gave the jury subsections (d)(1) through (d)(3) of the regulation, and two and a half sentences of subsection (d)(4)(i). Defendant did not object to the introduction of the exhibit, but raised the issue while the jury deliberated and again in his motion for judgment of acquittal. The district court denied the motion, because (1) counsel for defendant should have noticed this error as soon as the regulation was introduced, and (2) defendant suffered no prejudice as a result of the district court's alleged error.

On appeal, defendant attacks both contentions. However, we need only address the question of prejudice.

The only portion of § 1.46–3 relevant to defendant's good faith or lack thereof, § 1.46–3(d)(1)(ii), defines "placed in service" as "in a condition or state of readiness and availability for a specifically assigned function." As this part of § 1.46–3(d) was included in the exhibit, defendant was not prejudiced by the district court's failure to

provide less relevant subsections of the regulation to the jury.

Defendant claims that he was prejudiced because the partial definition of "placed in service" supplied by the court might have confused the jury, and that the district court therefore violated its duty "to charge the jury on all essential questions of law, whether requested or not," Brief for Appellant at 47 (citations omitted). As noted above, all *relevant* portions of § 1.46–3(d) were given to the jury. Thus, the district court fulfilled its duty to instruct the jury about relevant law, and the jury could not have been confused. We accordingly hold that defendant was not prejudiced by the district court's failure to submit all of § 1.46–3(d) to the jury. *See Caldwell v. United States*, 338 F.2d 385, 391 (8th Cir. 1964) ("[i]t is not error, but sometimes better practice, to read all or *part* of a criminal statute when instructing the jury"), *cert. denied*, 380 U.S. 984, 85 S.Ct. 1354, 14 L.Ed.2d 277 (1965) (emphasis added).

### E.

Finally, defendant argues that the district court should have declared a mistrial *sua sponte*, because some of the jurors slept and read magazines during the trial and discussed the case among themselves. In response, the government contends that defendant should have moved for a mistrial at trial, and that defendant was not prejudiced by the jury's inattentiveness.

■ Defendant relies primarily on an annotation explaining that a mistrial may be appropriate where, as here, jurors have slept during trial. *See* Annotation, *Inattention of Juror from Sleepiness or Other Cause as Ground for Reversal or New Trial*, 88 A.L.R.2d 1275 (1963). However, the same annotation states that "the courts have universally taken the view that the party claiming error must also demonstrate that as a result of the lack of attention the juror failed to follow some important or essential part of the proceedings." *Id.* at 1278–79. Defendant has not shown that the jury ignored any particularly important items. Instead, he has relied on a general assertion that jurors slept through parts of

"the critical presentation of [defendant's] evidence and the cross-examination of witnesses for the prosecution." Brief for Appellant at 54. Such assertions are too vague to establish prejudice. *See Tanner v. United States*, 483 U.S. 107, 125, 107 S.Ct. 2739, 2750, 97 L.Ed.2d 90 (1987) (finding no substantial evidence of jury incompetence where evidence "suggested, at worst, that several of the jurors fell asleep at times"). Accordingly, we find that the jury's inattentiveness was not sufficiently prejudicial to require a mistrial.

Defendant also argues that the district court should have declared a mistrial when it learned that jurors had talked among themselves about the case. It has been held that "normal jury pressures and intra-jury influences ... constitute no grounds for overturning a verdict." *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 151 (3d Cir.1975) (citations omitted), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Such "intra-jury influences" (as opposed to "extraneous influences") include "evidence of discussions among jurors," *id.* at 150. Accordingly, we hold that even if the jurors discussed the case among themselves, the district court was not required to declare a mistrial.

In sum, we hold that the evidence of jury inattention and misconduct in this case does not require reversal.

### III.

For the reasons stated above, we reject all of defendant's claims and affirm the judgment of the district court. The motion for remand and temporary stay of appellate proceedings is denied as moot; we express no opinion on the merits of any of the motions now pending in district court.

STUART, Senior District Judge, concurring.

I concur in all of the majority opinion except Part II(A)(1)(c).

I cannot agree that the testimony of the government's four witnesses who testified that the defendant participated in a December 29 conference call is immaterial to his guilt or innocence, rendering perjury on that issue unimportant. Although the newly discovered evidence involved credibility of witnesses, it was an important part of the government's evidence against the defendant. Defendant's credibility would have been seriously damaged by his denial that he participated in such a phone call in contradiction to the testimony of four witnesses. On the other hand, if the jury believed that the telephone records proved that the four witnesses committed perjury, their credibility on all other issues would be adversely affected.