# IN THE SUPREME COURT OF IOWA

No. 19–2075

Submitted December 14, 2021—Filed May 6, 2022

**STATE OF IOWA,**

Appellant,

vs.

**MARK BERNARD RETTERATH,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Mitchell County, James M. Drew, Judge.

The State appeals an order granting the defendant a new trial on his conviction for solicitation to commit murder. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which all participating justices joined. Waterman, J., took no part in the consideration or decision of the case.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellant.

Jessica Donels (argued), Alfredo Parrish, and Gina Messamer of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellee.

**McDERMOTT, Justice.**

A jury convicted Mark Retterath of solicitation to commit murder. Before his trial, Retterath sought to obtain the privileged counseling records of two of the State's key witnesses on the basis that these records might contain critical exculpatory information for his defense. The district court denied his requests. The court of appeals overturned this ruling and remanded for the district court to review the counseling records to determine whether they in fact contained exculpatory information and, if so, whether Retterath should receive a new trial.

But the statute that establishes the process for this type of review doesn't explain how the court is to *acquire* the records in the first place. The documents that the defendant seeks are confidential medical records; the court doesn't have them, the State doesn't have them, and the defendant obviously doesn't have them. In this case, one of the two witnesses refused to waive his privilege and voluntarily permit the release of his records. The district court ordered the State to procure the records. The State subpoenaed two federal agencies believed to have the records. But these agencies, citing limitations on disclosing patient health records under federal law, refused to turn them over.

With the State's subpoenas having hit an apparent dead end, the State and Retterath deemed the records unobtainable. The district court, finding itself without any medical records to review, presumed that the records contained exculpatory information and granted Retterath a new trial at which the key witness associated with the missing records would be barred from testifying.

The State appealed. The court of appeals reversed the district court's ruling, holding that the unavailability of the records didn't entitle Retterath to a retrial. We granted Retterath's request for further review.

I.

A.

The peculiar facts of this case bear some resemblance—intentionally so, apparently—to those seen in fictional television dramas. Retterath was charged in 2015 with sex abuse in the third degree for sexually abusing his neighbor, C.L. (whom, to avoid repeated use of initials, we'll refer to as "Cal," although that's not his real name). While out on bail, Retterath allegedly then formed a plot to kill Cal with two other men, Aaron Sellers and J.R. (whom we'll similarly refer to as "Junior"). According to Sellers, the method of murder developed as a copycat to a surreptitious poisoning technique employed in the acclaimed television show *Breaking Bad*. It involved acquiring castor beans, extracting the deadly toxin ricin from the beans, mixing the ricin with recreational drugs, and leaving the drugs for Cal to find and ingest. Cal's death from the poison, it was hoped, would appear to be an accidental drug overdose.

At trial, as to the murder plot, Sellers testified that Retterath at one point discussed paying a hitman (apparently with silver bullion as the form of payment) to shoot Cal. Sellers also testified about Retterath's pursuit of the ricin-from-castor-beans plan, and that Retterath even showed him castor beans that he'd purchased online. Sellers stated that Retterath asked him to write down a list of items needed to carry out the murder plot. The list (offered as an exhibit)

included "6 big rolls of wide duct tape," "50 or 60 large heavy duty Hefty bags" without drawstrings, a "SawsAll" (a type of powered reciprocating saw) with "3 new blades . . . 6 inches long," a power cord, "25 gallon containers gasoline," large sections of "Vi[s]queen" (a type of polyethylene plastic sheet) or tarps, and "vacuum sealer (food saver)" bags, along with $220 cash that Retterath owed Sellers. Sellers testified that he ultimately told Retterath he wasn't interested in being part of the murder plot. When Retterath purportedly asked if Sellers knew anyone else who might be, Sellers responded that he'd look into it but never intended to and never did.

On cross-examination, Sellers admitted that Retterath sometimes appeared simply to be "venting" about Cal and that Sellers had told police that the plans to kill Cal were at least somewhat "fantastical" and "dude was just talking." Sellers admitted that he didn't have any knowledge that Retterath had actually put ricin-laced drugs out for Cal to consume or that he'd hired a hitman to shoot Cal. Retterath's lawyer didn't ask Sellers about his mental health on cross-examination.

Junior testified at trial that he was a drug addict but had been sober for roughly four months leading up to trial. Junior similarly testified that after Retterath's arrest for sexually abusing Cal, Retterath frequently talked about killing Cal, including the plot to put ricin in drugs for Cal to consume after Junior had described a similar ricin extraction and poisoning on an episode of *Breaking Bad*. The two apparently agreed that heroin would be the best drug to mix with the ricin because it was most similar in color. Junior described his role in the

plot involved getting the drugs and placing them at Cal's house since Retterath had a no-contact order with Cal. Junior testified that Retterath had shown him the castor beans he'd purchased and printouts of how to build a machine to extract ricin from the castor beans.

On cross-examination, Junior admitted that he frequently talked about getting drugs with Cal and that on one occasion Cal paid Junior to get him drugs. He acknowledged that, in his deposition on Retterath's sex abuse charge, Retterath was often "venting" about being angry with Cal. Junior admitted to never seeing any actual ricin, only the intact castor beans. And Junior also admitted that during the time of the alleged plot he was still using drugs.

Sellers and Junior went to the police to report their concerns about Retterath's activities, which instigated an investigation that resulted in adding solicitation of murder and attempted murder charges against Retterath in addition to the pending sex abuse charges.

The parties had access to the transcript of a deposition taken of Sellers from April 2015 in an unrelated shooting case. Sellers in this 2015 deposition noted that his parole officer had described him as "one of the best liars they've ever dealt with." He admitted to lying both to his probation officers and to the police officers investigating the shooting case. Sellers stated that he'd been diagnosed with schizophrenia and was taking medication for it. His symptoms included auditory hallucinations. Sellers also admitted to drinking while on his medication, describing the substances in combination as making him "loopier" and intensifying the intoxicative effect.

Sellers was also deposed in this case a year later—in April 2016. At that time, he testified to being on disability for post-traumatic stress disorder (PTSD). He also indicated he was currently receiving mental health treatment. But when asked, "Are you willing to talk to me about your diagnosis that leads to your treatment that you had for the PTSD and the disability?", Sellers answered, "No." Retterath's lawyer didn't pursue that line of questioning further.

Retterath filed pretrial motions requesting that the district court review the confidential medical records under section 622.10(4) of Cal, Sellers, and Junior. The district court denied the motion as to Sellers and Junior. At trial, the jury heard testimony from Sellers, Junior, Retterath, and a collection of other witnesses. Retterath didn't ask Sellers about his mental health or try to introduce his deposition testimony regarding his schizophrenia. The jury convicted Retterath of sex abuse in the third degree, solicitation to commit murder, and attempted murder.

B.

Retterath appealed, arguing that the evidence was insufficient to support his convictions and that the district court erred in denying his pretrial motions seeking the court's review of Sellers's and Junior's privileged counseling records under Iowa Code section 622.10(4) (2018). The court of appeals agreed with Retterath that there was insufficient evidence to support the conviction on the attempted murder count because the State failed to prove that Retterath "assaulted" Cal by committing an overt act, and reversed his conviction as to that count. The court of appeals also determined that the district court erred in

denying Retterath's requests to review Sellers's and Junior's mental health records since he'd made a "plausible showing" under Iowa Code section 622.10(4)(*a*)(2) that the records contained exculpatory information unavailable from another source.

The court of appeals in its remand order directed that if, after reviewing the records, the court found no exculpatory evidence, then it was to affirm the conviction for solicitation to commit murder. But if it found exculpatory evidence in the records, it was to perform the balancing test outlined in the statute to assess whether Retterath should receive a new trial on the conviction for solicitation to commit murder.

On remand, the district court entered an "Order for Production of Documents" that granted Retterath's earlier pretrial motions requesting that the district court review the confidential medical records of Sellers and Junior under section 622.10(4). The order specified: "The State shall produce the requested records to the undersigned without unreasonable delay and file a notice of compliance with the clerk identifying the facilities from which the documents were obtained and the number of pages from each."

The State obtained Junior's records. But the State had no similar success in procuring Sellers's records. Sellers refused to consent to releasing his records. The State issued a subpoena for the records to two federal agencies: the United States Social Security Administration and the United States Probation and Parole Office. Both agencies refused to comply. According to filings by the State, the Social Security Administration's Office of General Counsel responded that

the state-issued subpoena supplied none of the conditions necessary to permit release of the confidential records. The Probation and Parole Office sent the State an email refusing to turn over records on the same grounds, and further refusing to provide the names of the "vendors"—the clinics where Sellers actually received treatment.

Confronted with these denials from federal agencies based on federal law, in an email exchange between the district court and the lawyers for the parties, the district court asked the lawyers for both parties to look into other possible methods for acquiring the records. In response, Retterath's lawyer contacted an administrative law judge with the Social Security Administration but was unable to make progress around the earlier denial.

Retterath ultimately filed a motion to dismiss his solicitation-of-murder conviction, alleging a violation of his statutory right to an in camera review based on the State's failure to produce Sellers's records. The State resisted, arguing that it wasn't responsible for the delay and that dismissal of the conviction would constitute a remedy beyond the scope of the court of appeals remand order. The district court denied the motion to dismiss but ordered that Retterath receive a new trial with Sellers barred from testifying. The State appealed. The court of appeals reversed, holding that the district court erred in finding that records unavailable for review under section 622.10(4) should be presumed exculpatory, and thus holding that the district court erred in granting a new trial. We granted Retterath's application for further review of the court of appeals ruling.

II.

Iowa Code section 622.10 generally prevents a mental health professional from disclosing "any confidential communication properly entrusted to the person in the person's professional capacity" associated with the patient's treatment. Iowa Code § 622.10(1). The statute specifically forbids disclosing these records to a defendant in a criminal action, with two exceptions.

The first exception requires a showing that the holder of the privilege voluntarily waived the confidentiality privilege. *Id.* § 622.10(4)(*a*)(1). The second exception requires the defendant to demonstrate a "reasonable probability" that the records are "likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." *Id.* § 622.10(4)(*a*)(2)(a). If the defendant satisfies the threshold showing for the second exception, the district court must review the records "in camera" (privately, without the parties present) to determine whether the records contain exculpatory information. *Id.* § 622.10(4)(*a*)(2)(b). If the court determines from its review that the records contain exculpatory information, the court must then "balance the need to disclose such information against the privacy interest of the privilege holder." *Id.* § 622.10(4)(*a*)(2)(c). If the court finds the balance tilts in favor of disclosure, the portions of the records containing exculpatory information must be disclosed to the defendant and counsel. *Id.* § 622.10(4)(*a*)(2)(d).

The statute doesn't address what happens when the witness's records are reasonably likely to contain exculpatory information but are unavailable for

review. The statute likewise doesn't address an equally important preliminary question: Which party bears the burden of seeking and acquiring the confidential records for the review in the first place?

We've recognized a witness's right to maintain the privilege covering her own medical records in disputes applying section 622.10(4). In *State v. Thompson*, we analyzed a facial challenge to the constitutionality of section 622.10(4) in a case where the defendant sought an alleged victim's confidential records. 836 N.W.2d 470, 489–90 (Iowa 2013). In upholding the constitutionality of the statute, we stated that a witness's privilege in keeping confidential the witness's own medical records may outweigh the defendant's constitutional right to present a complete defense. *Id.* If a defendant's "general due process right" allowed the defendant to acquire *all* privileged evidence in discovery, we reasoned, many important privileges that courts have long protected (spousal, clergy, attorney–client, among others) would be undermined. *Id.* We found that the statute's procedures struck an appropriate balance among the competing rights at issue. *Id.* at 490.

Retterath argues that he has a statutory *entitlement* to the court's private review of the witness's medical records because the statute states that "the court *shall* conduct an in camera review" after the defendant establishes a reasonable probability that the records contain exculpatory evidence. Iowa Code § 622.10(4)(*a*)(2)(b) (emphasis added). Because that review didn't happen, Retterath urges, his remedy is a new trial, this time without that witness's testimony. His argument at least implicitly presupposes a duty on the State to

procure the records of any prosecution witness whose records are subject to the section 622.10(4) review and a right not to be confronted with testimony from any witness if the State fails in this duty. But a closer analysis of the duties at issue—and who properly bears those duties—suggests that this premise is flawed.

Prosecutors must seek to ensure that defendants receive a fair trial, as their primary objective is "to see that justice is done, not to obtain a conviction." *State v. Graves*, 668 N.W.2d 860, 870 (Iowa 2003). But a criminal prosecution remains an adversarial process, and a prosecutor's duty to ensure a fair trial doesn't mean that the State must work both sides of the case. "The prosecutor has no duty to seek out exculpatory evidence." *Hamann v. State*, 324 N.W.2d 906, 914 (Iowa 1982). Likewise, "[t]he prosecution bears no responsibility to volunteer information not in its possession and of which it is unaware." *Id.*; *see also United States v. Tierney*, 947 F.2d 854, 864 (8th Cir. 1991) ("It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.' " (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975))). In fact, Retterath has not asked that *the State* be ordered to produce the records; he just asked for "subpoenas of the mental health records of Aaron Sellers."

Iowa Rule of Criminal Procedure 2.14(2)(*a*)(1) requires that prosecutors turn over documents in discovery that are "within the possession, custody or control of the state." This includes "a duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case, including the

police." *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (omission in original) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). But "when evidence is equally accessible to the defendant and the State, the State is not required to produce it." *State v. Stratton*, 519 N.W.2d 403, 405 (Iowa 1994).

It's undisputed that the confidential records sought in this case are not in the custody of the State or any of its agents. In a criminal case, the prosecution generally bears both the "production burden," meaning that the state must come forward with the evidence to support its claims, and the "persuasion burden," meaning that the state bears the responsibility to convince the fact finder of its contentions (to the "beyond a reasonable doubt" standard in criminal cases). *See State v. Lewis*, 242 N.W.2d 711, 717 (Iowa 1976) (en banc). A defendant may, but isn't required to, introduce evidence to counter the state's case. *State v. Stump*, 119 N.W.2d 210, 218 (Iowa 1963) ("In the trial of a criminal case a defendant is not required to do anything.").

In this case, the counseling records that Retterath seeks are designed to impeach the credibility of the State's witness. The State generally has no duty to obtain discovery not within the "possession, custody or control" of the State or parties under the State's control to enable the defendant to impeach the State's witnesses. Iowa R. Crim. P. 214(2)(*a*)(1); *Hamann*, 324 N.W.2d at 914. That responsibility naturally resides with the defendant. "Due process does not preclude placing the burden of production on an accused person on a defensive issue in a criminal case." *Skinner v. Ruigh*, 351 N.W.2d 182, 185 (Iowa 1984).

Allocating discovery responsibilities on parties in this fashion logically aligns both incentives and access. Where the state has no better access to discovery materials that the defendant seeks than does the defendant, the defendant possesses a far stronger incentive to track down the materials than does the state. *See State v. Galloway*, 187 N.W.2d 725, 729 (Iowa 1971). The district court order required the State to procure the counseling records in this case, which is contrary to this principle.

Retterath acknowledged at oral argument that there might well be other means to obtain Sellers's mental health records that he did not pursue in the district court. He conceded at oral argument, for instance, that he could have deposed Sellers and asked for the names of Sellers's individual providers of counseling services and then issued subpoenas directly to those providers. Or if entities outside the federal government actually paid the bills of Sellers' mental health providers, Retterath could have sought information from them. And indeed, in Retterath's original motion to subpoena the records, Retterath states that he sometimes drove Sellers to counseling appointments, and even specifically *identifies by name* a clinic where Sellers received treatment.

Retterath thus had information about at least one provider from whom counseling records could be sought directly, and potentially without the need to overcome the obstacles presented by the federal agencies. The record doesn't explain why, exactly, subpoenas were issued only to the federal agencies. We're left to speculate that the potential federal agencies were chosen for subpoena purposes because Sellers perhaps had to provide his counseling records for proof

of eligibility for Social Security disability benefits or payment of services, or for proof of compliance with probation requirements. But nothing in the record suggests that the Social Security Administration or Probation and Parole Office actually provided the counseling services at issue to Sellers, and indeed the Probation and Parole Office's response to the subpoena—that it could not disclose the names of the "vendors" of the services—supports this.

What's more, a party unable to acquire documents from federal agencies using a subpoena might also obtain the records by making a "*Touhy*" request. *See U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). *Touhy* regulations provide procedures for parties requesting federal documents when, as in this case, the federal government isn't a party to the case. If the federal government improperly denies a state criminal defendant's *Touhy* request, the defendant "may assert his constitutional claim to the investigative information before the district court, which possesses authority under the APA to compel the law enforcement agency to produce the requested information." *United States v. Williams*, 170 F.3d 431, 434 (4th Cir. 1999) ("APA" referring to the federal Administrative Procedure Act). The record suggests that the State did pursue a *Touhy* request with at least one of the federal agencies, but neither Retterath nor the State appealed the decision denying the request.

Retterath hasn't alleged, let alone attempted to show, that the State acted in bad faith or otherwise did anything to purposefully deny him access to this evidence. In *State v. Dulaney*, we held that evidence of a blood test was still admissible despite the State's accidental destruction of the original blood

sample. 493 N.W.2d 787, 790 (Iowa 1992). Our analysis would certainly be different if Retterath were to establish that the State, for example, persuaded a witness not to waive her privilege or otherwise obstructed access to the records sought under the statute. But lacking this type of evidence of bad faith by the State, the remedy that Retterath seeks in this case—a new trial that bars testimony from a key witness because the witness hasn't voluntarily agreed to divulge his own confidential health records—is an extreme remedy absent in the language of section 622.10(4).

Retterath acknowledged on appeal that other possible avenues to pursue the information have not been exhausted. The defendant himself claimed to have personally driven Sellers to a counseling appointment and (in an earlier motion) even named the clinic. On the record before us, we simply are not convinced that the records were truly unobtainable from any source. It's worth noting, too, that after declaring the records unobtainable, each side proceeded to argue that the unobtainability of the records required a ruling in *its* favor.

Both the parties and the district court were without the benefit of our opinion today placing the burden on the defendant to pursue to the fullest extent possible all paths for obtaining the records under section 622.10(4). The district court's order directs the State, not Retterath, to procure the confidential records in this case. The trial court erred in allocating the discovery burden and ordering a new trial without requiring the defendant to show that he'd exhausted every available avenue to lawfully obtain the medical records for the court to review.

As we've stated before, "When a district court doesn't have the guidance of a particular test or applies the incorrect standard, 'we remand for new findings and application of the correct standard.' " *State v. Barrett*, 952 N.W.2d 308, 314 (Iowa 2020) (quoting *State v. Robinson*, 506 N.W.2d 769, 770–71 (Iowa 1993)). The appropriate remedy in this case is to remand to give Retterath an opportunity to fulfill *his* burden—as we've now established—to obtain the confidential records he seeks under section 622.10(4). Retterath may, and indeed should, avail himself of every weapon in the discovery arsenal at his disposal in pursuit of the records.

The unavailability of Sellers's mental health records, should Retterath fail in his forthcoming attempt to obtain the records, will *not* entitle Retterath to a new trial and the exclusion of Sellers's testimony. Again, the records are not in the State's possession or control, and a trial without them thus doesn't create a due process or compulsory process violation. *See, e.g.*, *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir. 1985) ("While the prosecution must disclose any information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess or of which it is unaware." (citations omitted)). Nor is there a Confrontation Clause violation in this case. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) ("[T]he Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam))). Indeed, the record makes clear that Retterath

*already had* information about Sellers's mental health issues that he could have used to impeach Sellers in front of the jury. Retterath already possessed, for instance, Sellers's sworn admissions in a deposition that he'd been diagnosed with schizophrenia, had experienced auditory hallucinations, and would sometimes drink while taking his medication. Yet Retterath didn't attempt to cross-examine Sellers with any of this existing material. We find, on the record before us, that Retterath is not entitled to a new trial if Sellers's mental health records ultimately prove unobtainable on remand.

## III.

We lack the gift of prophecy to enable us to say with certainty whether Retterath will be successful in procuring Sellers's counseling records directly from Sellers's actual providers or whether the records are truly unobtainable. But we find the discovery burden to obtain the records was improperly placed on the State rather than Retterath. On remand, if Retterath successfully procures the records, the district court must then conduct its review of any records obtained—as it still must do for the records already obtained for Junior— under the materiality standard we described in *State v. Barrett* to determine if Retterath should receive a new trial. 952 N.W.2d at 313–14. Retterath's potential failure to procure Sellers's mental health records will not entitle him to a retrial.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except Waterman, J., who takes no part.